**DEPARTMENT OF ECONOMIC DEVELOPMENT, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO. (U.S.A.), Arthur Andersen & Co. (Republic of Ireland), Arthur Andersen & Co. (United Kingdom), Richard E. Beckman, Richard L. Measelle, and Edward A. Massura, Defendants–Third–Party Plaintiffs,**

v.

**Alex H. FETHERSTON, C. Shaun Harte, Ronald J. Henderson, Anthony S. Hopkins and James Sim, Third–Party Defendants.**

No. 85 Civ. 1292 (MBM).

United States District Court,
S.D. New York.

April 2, 1996.

452

Malcolm R. Schade, Robert Sidorsky, Mark D. Beckett, Kathleen E. McKay, Jack V. Valinoti, James Whelan, Nicole S. Polley, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for Plaintiff.

James D. Zirin, James J. Sabella, Brenda F. Szydlo, William C. Rand, Brown & Wood, New York City, for Defendants.

MUKASEY, District Judge.

The Department of Economic Development ("DED"), an agency of the British government operating principally in Northern Ireland, brings this securities fraud action against the accounting firm Arthur Andersen & Co. ("AA") and three of its partners, Richard L. Measelle, Edward A. Massura, and Richard E. Beckman. Defendants have moved for summary judgment on all claims on various grounds. For the reasons that follow, the motion is granted in part and denied in part as explained below.

## I.

A. *A Brief Summary of the DeLorean Motor Co. Debacle* [1] (1978–1983)

DED's predecessors, the Northern Ireland Development Agency ("NIDA") and the Department of Commerce ("DOC"), were agencies of the British government empowered to extend financial assistance to businesses to promote industrial development in Northern Ireland. On July 28, 1978, NIDA and DOC entered into a "Master Agreement" with several entities controlled by John Z. DeLorean ("the DeLorean entities"). The Master Agreement spelled out the contracting par-

---

[1]. Much of this summary is drawn, sometimes verbatim, from Judge Stewart's opinion on defendants' motion to dismiss. 683 F.Supp. 1463, 1468–70 (S.D.N.Y.1988). For a survey of litiga-tion involving John DeLorean, *see* Edward Lapham, *Unraveled Dream,* AutoWeek, Oct. 19, 1992, at 25.

ties' rights and obligations with respect to the development and manufacture of the DMC–12, a sports car with distinctive gull wing-shaped doors and a rust-proof stainless steel body. (Zirin Aff.Ex. 49) The car was to be manufactured in Dunmurry, an economically depressed, predominantly Catholic area near the Northern Ireland capital of Belfast.

The principal DeLorean entities and their respective roles will be summarized briefly here. The DeLorean Motor Company ("DMC") was incorporated in 1975 under the laws of Michigan for the purpose of developing, manufacturing, and marketing the DMC–12 sports car. John Z. DeLorean was Chairman of the Board and Chief Executive Officer of DMC. The car was manufactured at the plant of DeLorean Motor Cars Limited ("DMCL"), a subsidiary of DMC based in Northern Ireland. DMCL's common stock was owned by DMC, and DMCL's preferred stock was owned by NIDA. After the Master Agreement was signed, another entity, DeLorean Research Limited Partnership ("DRLP"), was formed on September 22, 1978, to raise money for research and development for the venture. DMC was the sole general partner of DRLP. The DRLP limited partners were a group of individual American investors including several Hollywood celebrities. *See generally Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040 (11th Cir.) (vacating district court's dismissal of securities fraud claims against AA by DRLP limited partners and DRLP liquidating trustee), *reh'g denied,* 806 F.2d 1070 (11th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); Judith Cummings, *An Audit Under Fire,* N.Y. Times, Mar. 16, 1986, § 3 at 4.

In the Master Agreement NIDA agreed, *inter alia,* to purchase all of the 17,757,000 preferred shares of DMCL at a price of £1 per share. (Master Agreement ¶ 1.1, Zirin Aff.Ex. 49 at 128) Although the stock certificates were delivered at the closing of the Master Agreement, NIDA was to pay for the shares in a series of "calls" to be made at DMCL's discretion. (*Id.*) NIDA and DOC also agreed to extend a variety of grants, loans, and loan guarantees to DMCL up to a maximum of £44,936,000. (Master Agree-

ment ¶¶ 7.1, 8.3.3 & Ex. F, Zirin Aff.Ex. 49 at 131, 133) To protect those investments, the Master Agreement provided that NIDA would appoint DMCL's financial comptroller and that DMC would "use its best endeavors" to insure that the boards of directors of DMCL and DMC each included two NIDA appointees. (Master Agreement ¶¶ 5.1.6, 6.4, 6.5, Zirin Aff.Ex. 49 at 129, 131) In addition, DMC issued a "put" to NIDA. Under the terms of the put, after four years NIDA could force DMC to purchase NIDA's DMCL preferred shares for the cash value of 6.5 million shares of DMC common stock. After 10 years, NIDA could force DMC to buy its DMCL shares at a price of £1 per share plus a premium. (Master Agreement ¶ 9.2, Zirin Aff.Ex. 49 at 133–34) In March 1980, the parties renegotiated the put. NIDA relinquished its original put rights in exchange for the single right, effective after four years, to force DMC to tender the cash value of 7 million shares of DMC stock in payment for NIDA's DMCL shares. (Zirin Aff.Ex. 50)

Pursuant to the Master Agreement, DMC and another DeLorean-controlled corporation, the John Z. DeLorean Corporation, undertook to furnish to NIDA and DOC "within 120 days following the end of [DMC's] fiscal year … a consolidated balance sheet at the end of such fiscal year and a consolidated statement of income for such year, together with notes thereto and the report thereon of DMC's auditors." (Master Agreement ¶ 6.1.5(b), Zirin Aff.Ex. 49 at 130) Those "Consolidated Financial Statements" treated DMC and its subsidiaries, including DMCL. AA, as DMC's auditors, prepared reports certifying the Consolidated Financial Statements. Those reports were issued in this country by AA's Detroit and New York offices. The first report, which certified the Consolidated Financial Statement covering the nine-month period ending August 31, 1978, was issued on November 20, 1978.

The gravamen of DED's complaint is that DMC's Consolidated Financial Statements were false and misleading, and that by issuing reports certifying these statements, AA substantially helped DeLorean and others to execute a securities fraud. According to DED, AA's reports misrepresented or failed

to disclose various questionable business transactions involving the DeLorean entities. Principally, DED alleges that AA inadequately investigated a November 1, 1978 contract between several of the DeLorean entities and GPD Services, Inc. ("GPD"), a Panamanian corporation not related to any of the DeLorean entities. (Schade Aff.Ex. 141) DED contends that GPD performed none of its obligations under the contract, and that GPD instead was used by DeLorean to siphon money from DRLP and DMCL. Funds paid to GPD allegedly were transferred to Swiss accounts of the Dutch bank Pierson, Heldring, Pierson, N.V., and then loaned back to DeLorean at below market interest rates. DeLorean allegedly used the proceeds of the Pierson loan to repay a debt to Continental Illinois Bank incurred in connection with DeLorean's acquisition of Logan Manufacturing Company, a manufacturer of snow-grooming equipment and tracked vehicles based in Utah. DED alleges that AA knew or should have known of those transactions, but neglected to disclose its knowledge or its suspicions in its audit reports.

In late 1981, the DeLorean entities began to collapse amid allegations of mismanagement and fraud. On February 19, 1982, DMCL was placed in receivership. On October 25, 1982, DMC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, and in December 1983 that proceeding was converted into a Chapter 7 liquidation. DED estimates that it suffered millions of dollars in damages as a result of the demise of the DeLorean entities. (Second Am. Compl. at 224)

## B. *DED's Original Complaint* (1985)

On February 15, 1985, DED filed its initial complaint in this action, naming as defendants three branches of AA's worldwide partnership.[2] In that complaint, DED alleged that AA committed primary violations and aided and abetted violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. In addition, DED asserted civil claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(a)-(d), as well as a claim for aiding and abetting DeLorean's RICO violations. Finally, DED included common law claims for negligence, breach of contract, fraud, and aiding and abetting fraud. The case was assigned to the late Judge Charles E. Stewart of this Court.

## C. *AA's Motion to Dismiss* (March 1988)

AA moved to dismiss the claims in the original complaint on various grounds. Pursuant to Fed.R.Civ.P. 12(b), Judge Stewart partially converted the motion to a motion for summary judgment after both parties submitted materials outside the pleadings for the Court's consideration. Judge Stewart issued an opinion on the motion in March 1988. 683 F.Supp. 1463 (S.D.N.Y.1988).

First, he found that it was appropriate to apply the American securities laws in this action because a substantial part of the conduct giving rise to the fraud claims took place in the United States. *Id.* at 1471.

Second, he held that material issues of fact prevented a summary judgment as to whether the Master Agreement is a security for purposes of Rule 10b–5. Under *Securities & Exch. Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), a financial instrument will be deemed an investment contract and therefore a security if the purchaser "invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 299, 66 S.Ct. at 1103. AA has maintained that NIDA and DOC did not "invest" with the expectation of profit, and that because NIDA participated in the management of DMCL, investment return did not depend solely on the efforts of others. 683 F.Supp. at 1473–74.

2. DED's complaint named as defendants Arthur Andersen & Co. (USA), Arthur Andersen & Co. (Republic of Ireland), and Arthur Andersen & Co. (United Kingdom). Judge Stewart found that there was "an issue of material fact as to whether defendants are part of one global partnership." 683 F.Supp. 1463, 1468 n. 1 (S.D.N.Y. 1988). Because the organizational structure of AA is irrelevant to the questions addressed here, and because neither party has revisited the issue in the memoranda of law, that issue will be resolved later, if necessary.

Third, he found that AA's allegedly fraudulent certification of DMCL's financial statements was not "in connection with the purchase" of a security for purposes of liability under Rule 10b–5 with respect to the Master Agreement. NIDA had committed to purchase the DMCL preferred shares when the Master Agreement was signed on July 27, 1978, several months before AA issued its first audit report. *Id.* at 1475–76. Judge Stewart explained that

> whatever the evidence of DeLorean's scheme to defraud, it is clear that defendants played no role in the initial sale of DMCL stock on July 28, 1978 and thus are not exposed to liability ... for any securities violation that occurred "in connection with" that sale.... It could plausibly be argued that DeLorean induced NIDA to buy DMCL stock as part of a scheme to defraud NIDA. In contrast, all of defendants' alleged participation in this fraudulent scheme dates from after this initial purchase of DMCL securities. Defendant's first report was issued on November 20, 1978, nearly four months after NIDA's initial purchase of DMCL stock. Plaintiff has tied defendants to an alleged fraudulent scheme, but defendants' fraudulent acts within that scheme were not in connection with the initial sale of securities.

*Id.* at 1479. The Court suggested that at most, AA aided and abetted the concealment of a fraudulent scheme involving the GPD contract, but that AA could not be liable for aiding and abetting the securities fraud itself. 683 F.Supp. at 1480 n. 14. Five years after Judge Stewart's decision, in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, ——, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994), the Su-preme Court held that there is no private civil liability under Section 10(b) and Rule 10b–5 for aiding and abetting securities fraud. DED accordingly did not reassert any aiding and abetting claim under Rule 10b–5 in the Second Amended Complaint.

Fourth, Judge Stewart denied summary judgment on the issue of whether the renegotiation of NIDA's put in March 1980 constituted a new purchase of a security for purposes of Rule 10b–5. He found material issues of fact as to whether that amendment to the Master Agreement produced "such significant change in the nature of the investment risks as to amount to a new investment." 683 F.Supp. at 1477–78 (*quoting Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978)).

Fifth, addressing DED's civil RICO claims, he found that DED stated a claim upon which relief could be granted under subsections (a)[3] and (c)[4] of 18 U.S.C. § 1962. He dismissed DED's claim under § 1962(b),[5] because DED had not set forth facts tending to show that AA purchased or maintained an interest in a racketeering enterprise. The Court also dismissed DED's § 1962(d)[6] conspiracy claim, because DED alleged no facts tending to show an agreement between DeLorean and AA to commit RICO predicate acts. 683 F.Supp. at 1482.

Sixth, Judge Stewart held that DED adequately alleged a cause of action for aiding and abetting a RICO violation and denied summary judgment as to whether DED's RICO claims were time-barred. *Id.* at 1483. The statute of limitations for RICO claims is four years. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156,

**3.** "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate or foreign commerce...." 18 U.S.C. § 1962(a).

**4.** "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enter-prise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c).

**5.** "It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain ... any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

**6.** "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). DED filed this action more than four years after most of the allegedly fraudulent conduct occurred, but asserts that it was prevented from filing the action sooner by AA's concealment of acts of fraud. AA has maintained that DED had actual or constructive knowledge of the fraudulent activities of DeLorean and his accomplices within the limitations period.

Finally, he denied a motion to dismiss based on forum non conveniens, finding that the Southern District of New York was not an inconvenient venue for this action. 683 F.Supp. at 1485. He declined to certify any part of the decision for interlocutory appeal. *Id.* at 1487. AA did not challenge, and Judge Stewart did not address, the pendent state law claims.

### D. *DED's First Amended Complaint* (July 1988)

After Judge Stewart's ruling, DED filed a First Amended Complaint ("FAC") in July 1988. (Zirin Aff.Ex. 1) In utter disregard of Fed.R.Civ.P. 8(a)'s call for a "short and plain statement," DED submitted a 240–page tome laden with excessive evidentiary detail. DED asserted most of the same claims included in its first complaint, but dropped the RICO claims under subsections (b) and (d) of § 1962 which Judge Stewart had dismissed.

### E. *Subsequent Procedural History* (1990–1993)

After the March 1988 ruling, AA asserted claims pursuant to Fed.R.Civ.P. 14 against third-party defendants Alex H. Fetherston, C. Shaun Harte, Ronald J. Henderson, Anthony S. Hopkins, and James Sim. These men were NIDA-appointed members of the boards of directors of DMC and/or DMCL. The third-party defendants moved to dismiss the claims in the third-party complaint in 1990. Judge Stewart dismissed all claims against Henderson for lack of personal jurisdiction. 747 F.Supp. 922, 929 (S.D.N.Y. 1990). On the merits, Judge Stewart granted the remaining defendants' motion to dismiss as to all claims except those for indem-

nity for negligence, and contribution for common law fraud and negligence. *Id.* at 944–45. The Court denied AA's request for leave to replead. 739 F.Supp. 804 (S.D.N.Y. 1990).

In 1991, Judge Stewart ordered DED to produce for discovery numerous documents which DED had claimed were protected by executive, attorney-client, and work product privileges. 139 F.R.D. 295 (S.D.N.Y.), *re-cons. denied,* 139 F.R.D. 594 (S.D.N.Y.1991). That ruling is discussed at length below in Part IV.(15) of this opinion. In summer 1993, Judge Stewart ruled on two smaller discovery disputes. *See* 1993 WL 293719 (S.D.N.Y. July 29, 1993) (granting leave to depose Pamela Newman in London, England); 1993 WL 293701 (S.D.N.Y. July 29, 1993) (holding that AA bears the burden of requesting a waiver of Parliamentary privilege in connection with deposition of L. Calvert).

In the wake of *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991) (adopting one year/three year limitations and repose structure of the federal securities laws for claims under Rule 10b–5), AA moved to dismiss DED's federal securities fraud claims on statute of limitations grounds. Judge Stewart denied the motion on the authority of the Federal Deposit Insurance Corporation Improvement Act of 1991, which added § 27A to the Securities Exchange Act of 1934. 15 U.S.C. § 78aa–1. That legislation barred the retroactive application of *Lampf.* 1992 WL 77542 (S.D.N.Y. Apr. 8, 1992). Judge Stewart relied on subsection (a) of § 27A; he did not apply subsection (b) of that provision, which was declared unconstitutional on separation of powers grounds in *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1447, 1463, 131 L.Ed.2d 328 (1995).

This case and its companion, *Allard v. Arthur Andersen & Co.,* 924 F.Supp. 488 (S.D.N.Y.1996) a suit against AA by the bankruptcy trustee of DMC, were reassigned to my docket in early 1994.[7] In early spring

---

7. AA simultaneously has moved for summary judgment in the *Allard* action. The ruling on

of that year, AA moved for summary judgment. At a pretrial conference held on April 11, 1994, I granted DED leave to file a streamlined Second Amended Complaint and directed AA to resubmit a motion for summary judgment addressed to the new complaint. *See* Schade Aff.Ex. 8.

### F. *DED's Second Amended Complaint (1994)*

On May 9, 1994, again in defiance of Fed. R.Civ.P. 8(a), DED filed a 225–page Second Amended Complaint ("SAC"). In response to the court's earlier request that DED pare down the complaint, DED simply reduced the line spacing and the size of the margins in the document. As a result, the Second Amended Complaint is 15 pages shorter than its predecessor, but each page is more dense.

DED asserts eight claims in the Second Amended Complaint: (1) common law negligence, (2) breach of contract, (3) common law fraud, (4) aiding and abetting common law fraud or breach of a fiduciary duty, (5) securities fraud under Rule 10b–5, (6) violation of 18 U.S.C. § 1962(c) (RICO), (7) aiding and abetting RICO violations, and (8) violation of 18 U.S.C. § 1962(d) (RICO). The eighth claim is renascent—Judge Stewart dismissed the RICO conspiracy claim in 1988 and DED did not replead that claim in the First Amended Complaint. For reasons explained above in Part I.C of this opinion, DED has dropped its claim for aiding and abetting a violation of Rule 10b–5. DED also has dropped its claim under § 1962(a) of RICO, presumably because DED is unable to prove that NIDA and DOC suffered actual damages as a result of the investment of racketeering income in an enterprise. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990). AA has moved for summary judgment on all eight remaining claims.

### II.

■ Subject matter jurisdiction here is premised on 15 U.S.C. § 78aa, 18 U.S.C. § 1964, 28 U.S.C. § 1331, and federal common law principles of pendent jurisdiction. Jurisdiction could not be premised on diversi-

ty of citizenship under 28 U.S.C. § 1332(a)(4). Plaintiff is an agency of the British government deemed to reside in the United Kingdom. Defendant is a partnership including partners resident in the United Kingdom. Because § 1332 requires complete diversity and does not permit suits by aliens against other aliens, this action could not be brought as a diversity suit. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 788 (2d Cir.1980) ("the fact that alien parties were present on *both* sides would destroy complete diversity") (emphasis in original), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981).

■ The federal supplemental jurisdiction statute, 28 U.S.C. § 1367, has no application in this case because that statute became effective in 1990, five years after DED commenced this action. *See Kreuzfeld v. Carnehammar,* 138 F.R.D. 594, 608 (S.D.Fla. 1991) (§ 1367 does not apply retroactively). However, the judge-created principles upon which § 1367 was based do apply. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (state law claims that derive from same "nucleus of operative fact" as jurisdictionally sufficient federal claims arise under same "case or controversy" for purposes of federal subject matter jurisdiction). The doctrine of pendent jurisdiction permits the assertion of jurisdiction over DED's state law claims.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making that assessment, the court resolves disputed factual issues against the movant and construes the evidence in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

that motion also is issued today.

## III.

AA asserts the following arguments in support of its motion for summary judgment: (1) DED cannot establish transaction causation because NIDA and DOC would not have acted differently in the absence of the alleged misrepresentations. (2) DED cannot prove loss causation because economic recession—not the alleged fraud—caused the losses suffered by NIDA and DOC. (3) DED lacks standing to sue under RICO. (4) AA did not participate in the "operation or management" of a RICO enterprise as is required for liability under § 1962(c). (5) DED has not set forth facts tending to show an agreement between AA and DeLorean to commit RICO predicate acts as is required for liability under § 1962(d). (6) There is no cause of action for aiding and abetting a RICO violation. (7) DED's Rule 10b–5 claim is foreclosed as to both the Master Agreement and the March 1980 amendment thereto. (8) AA cannot be liable to DED for negligence under New York law because there was no privity between AA and NIDA or DOC. (9) DED's negligence claim is time-barred. (10) DED's breach of contract claim fails because NIDA and DOC were not intended third party beneficiaries of AA's contracts with the DeLorean entities. (11) Aiding and abetting common law fraud is not a recognized tort in New York. (12) DED's damages cannot include grants paid to DMCL, because repayment of these funds was never contemplated. (13) All claims against Measelle, Massura, and Beckman are time-barred. (14) The state law claims in this action should be dismissed for lack of subject matter jurisdiction, because there are no viable federal claims. (15) The court should permit public filing of the memoranda of law filed by the parties in connection with this motion.

These arguments will be addressed seriatim below.

## IV.

### (1) *Transaction Causation*

AA's first argument is a general attack on all the claims in the Second Amended Complaint. AA contends that DED cannot establish transaction causation, or reliance, for purposes of any of its claims. AA asserts that the British government was so desperate to create jobs in Northern Ireland that it would have continued to invest in the DMCL venture notwithstanding knowledge of DeLorean's misconduct. *See generally Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir.1992) ("the reliance element requires a showing that the violations under consideration caused the plaintiff to engage in the transaction"); *Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 618 (2d Cir.1991) (plaintiff must establish that "the alleged misrepresentations were a 'substantial factor' in or a 'significant contributing cause' of his investment decision"). Alternatively, AA argues that it was unreasonable as a matter of law for NIDA and DOC to rely on favorable representations about DeLorean or DMCL because indicia of irregularities at DMCL put NIDA and DOC on inquiry notice as to fraud. *See, e.g., Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 145 (S.D.N.Y.1989) ("the Second Circuit repeatedly has recognized that access to the truth bars a claim of reliance upon purported misrepresentations") (citations omitted).

DED disputes AA's characterization of the British government's investment strategy. DED argues that NIDA and DOC would have cut off financial assistance to the venture immediately had AA disclosed DeLorean's massive fraud.

### (a) *The Rule 10b–5 Claim and the Master Agreement*

With respect to DED's Rule 10b–5 claim, to the extent that claim is based on the original Master Agreement, this issue already has been decided in favor of AA. As explained above in Part I.C of this opinion, Judge Stewart ruled that AA's conduct was not "in connection with the purchase or sale of any security" for purposes of the Master Agreement because the alleged misrepresentations were made after July 28, 1978, the date on which NIDA committed to purchase the DMCL preferred shares. 683 F.Supp. at 1474–76. Judge Stewart reasoned that it would be impossible for DED to establish that NIDA, in making the initial decision to

invest, relied on representations uttered after that investment decision was made.

DED makes two attempts to resurrect this part of its Rule 10b–5 claim. First, DED argues that NIDA was not a "locked in" purchaser because the funding it was required to supply under the Master Agreement was paid in a series of calls after the issuance of AA's first audit report. Had NIDA known of the fraud that AA concealed, DED contends, NIDA would have been entitled to rescind the contract. Accordingly, DED concludes, AA's conduct did in fact induce NIDA to buy the DMCL preferred shares.

The short answer to that argument is that it was considered and rejected by Judge Stewart, who explained that

> a decision to rescind is not an investment decision. . . . The fact that NIDA paid for the DMCL stock over time rather than "up front" is irrelevant to the determination of when the "purchase or sale" took place for purposes of section 10(b).

683 F.Supp. at 1476.

▇ Second, DED informs the court that "[d]iscovery subsequent to [the 1988] decision . . . has produced evidence of AA's knowledge of, and participation in, fraudulent acts by DeLorean prior to July 28, 1978." (Pl.Mem. at 198–99) DED claims that on July 1, 1978, Measelle met with NIDA and DOC representatives in Detroit "to answer their questions about DeLorean's integrity, ability, and business plan." (Pl. Mem. at 199) In addition, DED charges that during negotiations in June 1978, Lochlann Quinn and Brian McGhee, accountants at AA's Dublin office, furnished NIDA and DOC with fraudulent financial projections. According to DED, AA issued unreasonably optimistic profit estimates and an inflated estimate of $18 million for research and development expenditures for the DMC–12. DED alleges that there was a material discrepancy between that $18 million and the estimate of $7 million for research and development expenditures that appeared in the prospectus for a March 14, 1978 offering of DMC common shares. (Schade Aff.Ex. 24 at 17, 28) DED charges that the $11 million difference represented the amount DeLorean planned later to misappropriate, and that AA's $18 million estimate somehow furthered DeLorean's plan to steal. (SAC ¶¶ 34–35)

DED's late-blooming and improvisational theory of reliance as to the Master Agreement is unconvincing. By the account of NIDA's own representative, the July 1 discussions with Measelle were general and bland. Measelle offered only general impressions about the expertise of DMC's management team and about the company's detailed planning efforts for the new sports car. *See* Mem. of C. Shaun Harte, Schade Aff.Ex. 80 at 1–2. DED accuses Measelle of neglecting to share vague concerns about "DeLorean's reasons for having left General Motors and his actual ability to carry out the project to completion." (Pl.Mem. at 55) But this is far from knowing concealment of fraud. DED cannot seriously contend that Measelle concealed DeLorean's theft of the proceeds of the GPD contract; in fact, the GPD contract was not formed until November 1978, several months after execution of the Master Agreement, and the alleged theft occurred even later. The most damning allegation DED can level about the July 1 meeting, consistent with the evidence and Fed. R.Civ.P. 11, is that Measelle did not disclose that DeLorean simultaneously was misleading the DRLP investors as to research expenditures. (Pl.Mem. at 199) But DED has offered principally unfounded speculation to connect Measelle at this early date to the allegedly misappropriated GPD contract proceeds. And even if DED could prove that AA helped DeLorean mislead the DRLP limited partners, that would not help DED here because DED has no standing to assert a claim arising from the sale of the DRLP partnership interests. *See* 683 F.Supp. at 1474.

Moreover, the July 1 meeting is not new evidence uncovered in discovery. DED was aware of that meeting as soon as it happened, several years before discovery commenced in this case. DED's failure to mention that meeting as the basis for its fraud claims prior to Judge Stewart's 1988 ruling belies the claim that representations made at that meeting were a substantial factor in

inducing NIDA and DOC representatives to sign the Master Agreement.

DED's reliance on financial projections is equally misplaced. First, DED has produced no evidence that anyone at AA believed that any estimate in the projections was unreasonable. DED merely assumes this and then imagines—the kindest verb I can summon—that AA fudged the projections in order to further DeLorean's later-developed plan to embezzle. In fact, the evidence shows that AA had a minimal role in formulating the projections, which apparently were based on internally generated DMC estimates set forth in the DRLP private placement memorandum. *See* Letter from Douglas Pfaff of AA–Detroit to Francis Barrett of AA–Dublin, Zirin Aff.Ex. 254 at 016258 ("I have enclosed a copy of [DMC's] current profit projections. We have not been involved in the preparation or detailed review of these projections").

Second, DED's emphasis on an alleged discrepancy undercuts its own case. If the projections truly played an important role in the decision to enter into the Master Agreement, and NIDA and DOC were aware of a material discrepancy in important financial data, this suggests that DED's predecessors saw and unreasonably ignored irregularities. Moreover, the discrepancy theory is itself incoherent. DED does not explain how the creation of an $11 million discrepancy in financial data would serve to conceal fraud. Intuitively, one would expect that a glaring discrepancy would bring attention to the source of the discrepancy; it is difficult to understand why anyone would create a conspicuous irregularity in order to disguise embezzlement.

Third, the financial projections in question, like the July 1 meeting, do not amount to new evidence uncovered in the course of discovery. If there was any discrepancy between the June 1978 projections and figures in the DMC offering materials, NIDA and DOC were aware of it 18 years ago. NIDA representatives have admitted they knew that AA had some involvement in the preparation of the projections, *see, e.g.,* Hopkins Dep., Schade Aff.Ex. 20 at 1165–66, and that they received and reviewed copies of the DMC offering materials as early as June

1978. *See, e.g.,* Hopkins Dep., Zirin Aff.Ex. 257 at 1152; Henderson Dep., Zirin Aff.Ex. 264 at 251; Harte Dep., Zirin Aff.Ex. 265 at 520. The projections, like the July 1 meeting, were not cited before Judge Stewart's 1988 ruling as a basis for the decision to enter into the Master Agreement. I refuse to accept that DED forgot events that now suddenly are identified as the critical impetus for a multi-million dollar investment. The more plausible explanation for DED's sudden change of course is that this is a clumsy attempt to avoid Judge Stewart's adverse ruling on the identical issue in his March 1988 opinion.

For the reasons expressed above, and consonant with Judge Stewart's 1988 ruling on this issue, DED's Rule 10b–5 claim is foreclosed with respect to funds committed pursuant to the original Master Agreement in July 1978. AA alleges that NIDA and DOC undertook a total financial commitment of more than £53 million at that time. Determination of the exact amount of funds affected by this ruling will require a more precise accounting and will be reserved for trial, if there is one and if such a determination then is necessary.

(b) *Transaction Causation for DED's Other Claims*

██ The requirement that fraud occur "in connection with the purchase or sale of any security" that defeats the Rule 10b–5 claim to the extent described above does not undo the balance of DED's claims. On the merits, the evidence on transaction causation insofar as it relates to those claims is equivocal. To be sure, the British government was under apparently extreme pressure to keep DMCL in business. *See, e.g.,* Letter of John E. Cammell, Vehicles Div., July 29, 1980, Zirin Aff.Ex. 61 at 00641566 ("It has always been recognized that this was a very high risk project only justified because of the importance of trying to improve the employment situation in West Belfast and thereby ease the security problem"). As Lord Brittan, the Chief Secretary of the Treasury, opined in May 1981, there was "no industrial case for extending assistance but [ ], on wider political grounds, the company probably cannot be

allowed to close." *See* Mem. of May 18, 1981, Zirin Aff.Ex. 248 ¶ 5; *see also* Mem. of Jock Bruce–Gardyne, Economic Secretary of the Dep't of the Treasury, "DeLorean: The Post–Mortem," Oct. 10, 1982, Zirin Aff.Ex. 195 ¶ 4 ("[o]nce such a folly is embarked upon it is remarkably difficult to stop. Prospects of employment have been created and must not be dashed"); Jock Bruce–Gardyne, Letter of Dec. 14, 1981, Zirin Aff.Ex. 238 ("The position of the Northern Ireland Office towards de Lorean is, as I commented in the House this summer, that of the young lady of Riga who went for a ride on a tiger. We are mounted; we cannot get off").

However, that hardly compels the inference that NIDA and DOC were prepared to fund DMCL at literally any cost. If the DMCL venture was as permeated with fraud as DED alleges it was, it defies common sense to think that NIDA and DOC would have continued to give DeLorean money. In fact, NIDA and DOC ultimately did refuse to extend further assistance when the venture foundered in late 1981 and early 1982. Moreover, many of the statements AA cites as illustrations of the fund-at-all-costs mindset were made in at least partial ignorance of the irregularities that later came to light. I find much more credible the concededly self-serving, after-the-fact testimony of British officials to the effect that NIDA and DOC would not have mindlessly laid out additional millions of pounds for a hopeless venture. As former Prime Minister Margaret Thatcher explained at her deposition, had the British government known that NIDA and DOC funds had

> not been used for the purpose of the people working in that factory, [and that] the funds have been misappropriated, the reason for giving any more would have fallen and so would the bona fides of the person to whom the assurance had been given. We should not both have been in good faith. That really would have gone to the root of the whole thing.

Thatcher Dep., Schade Aff.Ex. 308 at 56–57.

AA may be able to prove at trial that the investment decisions of NIDA and DOC would have been unresponsive to some extent to varying levels of knowledge of fraud. To that extent, the claims for relief may fail for lack of transaction causation. But this is far from saying that as a matter of law, knowledge of fraud would have had no effect on any investment decision of NIDA or DOC.

AA's alternative transaction causation argument—that any reliance by NIDA and DOC was unreasonable as a matter of law because British government officials knew of DeLorean's misconduct—goes to the merits of DED's fraud claims. AA points out that key British government officials harbored concerns about the risk of the venture and about DeLorean's personal integrity long before the collapse of DMCL. For example, on August 7, 1980, one member of Parliament commented that NIDA was "the laughing stock, not only of the international motor industry but, for all I know, the criminal fraternity as well, on account of the scale of this rip-off." Remarks of Mr. Alan Clark, Zirin Aff.Ex. 138. Similarly, on February 12, 1981, the Economic Secretary of the Department of the Treasury stated on the floor of the House of Commons that "DeLorean apparently has a T-shirt on which is emblazoned the slogan 'I am a con man.'" Remarks of Jock Bruce–Gardyne, Zirin Aff.Ex. 137.

In addition, AA insists that NIDA and DOC were or should have been alarmed at, *inter alia,* (1) the contents of an anonymous letter received by the Department of the Treasury in summer 1991 alleging an illegal transaction involving the GPD contract (Zirin Aff.Ex. 140), and (2) allegations on the floor of the House of Commons by Member of Parliament Nicholas Winterton of "a laundering of funds away from Northern Ireland." Zirin Aff.Ex. 159 at 2. AA also criticizes the NIDA nominee directors on the DMC board for failing to investigate the terms of the GPD contract, and attacks the credibility of DMC's financial officers—Walter Strycker and Harry DeWit—who have claimed that they communicated their suspicions about the GPD contract to AA.

The above evidence suggests that on several occasions, different government officials sensed that something foul was afoot at DMCL and communicated their suspicions to different audiences. But it is far from clear

whether the appropriate decision-makers knew the scope and details of the fraud allegedly perpetrated by DeLorean. Given the parties' differing accounts of the decline and fall of DMCL, and the susceptibility of the evidence to differing interpretations, it is not clear whether NIDA and DOC adequately investigated that which appeared suspicious. Similarly, it is not clear when AA realized what DeLorean had done and was doing.

In short, there are material issues of fact as to who knew what, and when they knew it. Summary judgment therefore is not warranted on this ground as to the remaining claims for relief.

### (2) Loss Causation

■ AA's second argument also is directed to all the claims in the Second Amended Complaint. AA asserts that a poor economy in general and weakness in the luxury car market in particular—not fraudulent accounting—caused the losses suffered by NIDA and DOC. (Pl.Mem. at 121, arguing that "the collapse of the DeLorean entities was caused by market forces, namely, a severe recession that rocked the entire automotive industry".) *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir.1994) ("when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases"), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995).

AA correctly observes that the launch of the DMC–12 coincided with a worldwide recession, and that NIDA and DOC were aware that adverse economic conditions threatened the viability of DMCL and its parent. *See, e.g.,* Dep. of Sir Kenneth Percy Bloomfield, Permanent Secretary of DOC, Zirin Aff. Ex 10 at 227 (acknowledging that the worldwide automobile market was "extremely depressed" in early 1982); Mem. on Report of Northern Ireland Dep't of Fin. & Personnel, Zirin Aff.Ex. 19 ¶ 10 (attributing demise of DMCL to, *inter alia,* "the unprece-

dented contraction in the car market in the United States due to the effects of cyclical recession compounded in the short term by weather conditions"); Mem. of Sir Kenneth Percy Bloomfield, Jan. 14, 1982, Zirin Aff.Ex. 199 ¶ 1 (noting that in December 1981, "sales of all cars in the USA fell to the lowest December figure since 1959, inventories soared to record heights and the industry shut down 29 plants").

Macroeconomic troubles undoubtedly had some negative effect on DMCL's survival. But it is not clear on the current record that the failure of DMCL was attributable entirely to market conditions. DED has cited statistics suggesting that the luxury car market fared better than the general car market in 1981, perhaps due to greater price inelasticity of demand in the luxury market segment. *See, e.g.,* Report of McKinsey & Co., Nov. 20, 1981, Schade Aff.Ex. 326 at 011843, 011853 ("Sales of luxury cars have held up well in the first 10 months of the year, despite the overall difficulties of the marketplace"); Letter of John E. Cammell, Vehicles Div., July 29, 1980, Zirin Aff.Ex. 61 at 00641566 ("luxury sports cars attract buyers who are somewhat insulated from short-term economic trends").

AA challenges the validity of DED's market data and the assumptions about the car market on which DED's statistical conclusions are based. AA argues that the market outlook was so bleak that DMCL would have failed even if the misappropriated funds had never been removed from DMCL's coffers. The parties have offered differing estimates of how much more money would have been required to save DMCL. *Compare* Dep. of Joseph H. Penrose, Schade Aff.Ex. 97 at 506 ($15–20 million of additional capital would have saved DMCL) *with* Conclusions of Cabinet Meeting, Jan. 21, 1982, Zirin Aff.Ex. 204 at ("it was almost certain that without further urgent Government assistance of some £47 million,[8] DeLorean Motor Cars would have to cease trading").

I find that the parties' conflicting submissions have created an issue of fact as to how

---

**8.** At the exchange rate of $1.87025 per £1 that prevailed on the international currency markets on January 22, 1982, £47 equals approximately

$87.9 million. *See Dollar Up, Gold Down as Interest Rates Rise,* N.Y. Times, Jan. 26, 1982, at D5.

much of the failure of DMCL was caused by a troubled car market. Accordingly, summary judgment cannot be granted globally for lack of loss causation.

### (3) *RICO Standing*

With respect to DED's RICO claims, AA argues as a threshold matter that DED does not have standing to maintain a RICO action.

Title 18 § 1962 declares unlawful certain conduct undertaken in connection with a "pattern of racketeering activity." Section 1961(1)(D) defines "racketeering activity" to include "any offense involving ... fraud in the sale of securities." Section 1964(c) establishes a civil action in favor of "[a]ny person injured in his business or property by reason of a violation of section 1962." The Supreme Court has construed that language narrowly and has found that a plaintiff does not have standing to sue under RICO absent "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992).

The Second Circuit has held that a plaintiff cannot establish such a "direct relation" merely by showing that he is a shareholder in, or creditor of, a corporation injured by a RICO violation. *Manson v. Stacescu,* 11 F.3d 1127, 1131 (2d Cir.1993) ("Since the shareholder's injury, like that of the creditor, is merely derivative of the injury to the corporation, the shareholder's injury is not related directly to the defendant's injurious conduct"), *cert. denied,* —— U.S. ——, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994).

However, the Second Circuit has recognized a "special duty" exception to the rule of no standing for creditors and shareholders. Under that doctrine, a plaintiff can maintain a RICO action if he sustained "injury that is separate and distinct from the injury sustained by the corporation." *Id.* For example, in *Ceribelli v. Elghanayan,* 990 F.2d 62 (2d Cir.1993), the "special duty" exception was successfully invoked by plaintiff shareholders who alleged that the defendant fraudulently concealed material information about the corporation, causing the sharehold-

ers to pay too much for their shares. The Court found that the shareholders had standing to sue under RICO because the defendant had duties to the shareholders as securities purchasers that were distinct from duties owed to the corporation. *Id.* at 64. Thus, when fraudulent activity induces the shareholder to become a shareholder in the first place, the injury is not merely derivative of the injury suffered by the corporation. *See, e.g., In re Colonial Ltd. Partnership Litig.,* 854 F.Supp. 64, 105 (D.Conn.1994) (injury was not merely derivative; plaintiffs claimed that "defendants' fraudulent conduct induced them to purchase their limited partnership interests"); *Friedman v. Hartmann,* No. 91 Civ. 1523, 1994 WL 97104, *3 (S.D.N.Y. Mar. 23, 1994) (plaintiffs have RICO standing because allegedly fraudulent representations were the "basis for inducing the plaintiffs to make their investments"), *recons. denied,* 1994 WL 376058 (S.D.N.Y. Jul. 15, 1994); *Dayton Monetary Assoc. v. Donaldson, Lufkin & Jenrette Secs. Corp.,* No. 91 Civ. 2050, 1993 WL 410503, *2 (S.D.N.Y. Oct. 14, 1993) ("plaintiffs do have standing to sue the trading defendants for injury proximately caused by alleged fraudulent representations which caused them to invest in limited partnerships which were worth less than they thought").

Fraudulent inducement is exactly what DED alleges here. DED does not claim simply that it owned shares of DMCL and that these shares became worthless when the company was victimized by RICO violations. Rather, DED argues that NIDA and DOC were induced by defendants' misrepresentations and fraudulent omissions to invest capital in DMCL. As the successor to defrauded securities purchasers, DED would have standing to assert RICO claims, assuming DED could establish liability for the underlying RICO predicate acts.

AA's fallback position is that AA did not in fact make fraudulent representations that induced NIDA and DOC to invest in DMCL. That contention goes to the merits of the fraud claims, on which I have found material issues of fact precluding summary judgment as explained above in Part IV.(1)(b) of this opinion.

*(4) Section 1962(c) (RICO)*

**A.**

AA argues that DED's claim under § 1962(c) is foreclosed by the Supreme Court's ruling in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). I agree.

Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

Securities fraud is one form of "racketeering activity." 18 U.S.C. § 1961(1)(D). A "pattern" of such activity means the commission of at least two predicate racketeering acts within 10 years. 18 U.S.C. § 1961(5). DED has argued that DMC and DMCL constituted a RICO enterprise, and that AA participated in the conduct of that enterprise's affairs through a pattern of acts of securities fraud and mail fraud. (Pl.Mem. at 295) In 1988, Judge Stewart denied AA's motion to dismiss this claim under Fed.R.Civ.P. 12(b)(6). 683 F.Supp. at 1483. However, in 1993 the Supreme Court narrowed the scope of liability under § 1962(c) with its decision in *Reves.*

*Reves* involved a § 1962(c) claim arising from the bankruptcy of a farmers' cooperative association that had issued promissory notes. The noteholders sued the co-op's accountants, Arthur Young & Co., charging that Arthur Young's audit reports fraudulently concealed the co-op's insolvency. The plaintiffs alleged that Arthur Young had failed to reveal in its reports, and had failed to inform the co-op's board of directors, that one of the co-op's key assets had been overvalued. 507 U.S. at 170–76, 113 S.Ct. at 1166–68. The plaintiffs argued that the co-op was a racketeering enterprise, and that Arthur Young participated in the conduct of the enterprise's affairs through multiple acts of securities fraud.

The Court barred recovery under § 1962(c). To be liable under that provision, the Court held, "one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. at 1173. The Court stressed that "*some* part in directing the enterprise's affairs is required." *Id.* at 179, 113 S.Ct. at 1170 (emphasis in original). Although an enterprise most typically is operated or managed by persons within an enterprise, the Court explained, "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184, 113 S.Ct. at 1173.

**B.**

██ Struggling to survive *Reves,* DED alleges in the Second Amended Complaint that AA's accountants participated in the operation and management of DMC and DMCL. (SAC ¶ 228(b)) DED argues that AA did this by

lending its reputation to the companies' courtship of public and private investors, participating directly in negotiations with prospective governmental investors, developing asset and earnings projections relied on by the investors, advocating the companies' positions before the SEC, chartering the Northern Ireland subsidiary, lending its staff to serve as company accountants, developing internal corporate policies, establishing accounting and information systems, creating the financial records and generating from them the financial statements it purported to audit, and even employing its partners and its venerable reputation to shield the companies from the slings and arrows of adverse publicity.

(Pl.Mem. at 302) DED asserts that AA is liable under § 1962(c) because the firm performed tasks that were "well beyond anything that could be characterized as routine auditing or accounting." (*Id.*)

*Reves* makes it more difficult to find "outsiders" such as accountants or lawyers liable under § 1962(c). *See MCM Partners, Inc. v. Andrews–Bartlett & Assoc., Inc.,* 62 F.3d 967, 979 (7th Cir.1995) ("Under the theory advanced in *Reves,* the accounting firm was considered by the Court as an 'outsider' to the enterprise, and ... as outsiders, the accountants had not participated in the oper-

ation or management of the cooperative"); *131 Main Street Assoc. v. Manko,* 897 F.Supp. 1507, 1527 (S.D.N.Y.1995) (the "operation-or-management rule is intended to spare from RICO liability true enterprise outsiders (such as accounting firms)"); *see also Amalgamated Bank of New York v. Marsh,* 823 F.Supp. 209, 219–20 (S.D.N.Y. 1993) (discussing Second Circuit's broader pre-*Reves* interpretation of § 1962(c)). In *Morin v. Trupin,* 832 F.Supp. 93 (S.D.N.Y. 1993), for example, the Court dismissed a § 1962(c) claim against a law firm that provided legal services to a limited partnership alleged to be a racketeering enterprise. The firm had provided tax opinions and tax information included in a private placement memorandum prepared for an offering of partnership interests. In addition, the firm had represented the partnership in audit proceedings before the Internal Revenue Service. The Court found that activity insufficient to establish participation in the operation or management of the partnership. *Id.* at 98.

Many other courts faced with post-*Reves* § 1962(c) claims against outside professionals have agreed that providing important services to a racketeering enterprise is not the same as directing the affairs of the enterprise. *See, e.g., Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521–22 (2d Cir.1994) (provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result"); *Nolte v. Pearson,* 994 F.2d 1311, 1317 (8th Cir.1993) (preparer of opinion letters and informational memoranda for RICO enterprise did not participate in "operation or management" of enterprise); *Morin v. Trupin,* 835 F.Supp. 126, 135 (S.D.N.Y.1993) ("providing legal advice and legal services does not constitute participation sufficient to ground an allegation of a violation of Section 1962(c)"); *Fidelity Federal Sav. & Loan Ass'n v. Felicetti,* 830 F.Supp. 257, 260 (E.D.Pa.1993) (even if appraiser's reports are "keystone" of enterprise's perpetration of fraud, appraiser can not be liable under § 1962(c)); *Sassoon v. Altgelt, 777, Inc.,* 822 F.Supp. 1303, 1307 (N.D.Ill.1993) (attorney did not participate in operation or management of RICO enterprise by drafting limited partnership offering documents and providing legal services to partnership); *Gilmore v. Berg,* 820 F.Supp. 179, 182–83 (D.N.J.1993) (accountant's preparation of opinion letter did not constitute participation in operation or management of client's business under *Reves* ).

After *Reves,* some plaintiffs have argued that an outside professional can participate in the operation or management of a RICO enterprise by knowingly concealing the enterprise's fraudulent activities. That argument properly was rejected in *Baumer v. Pachl,* 8 F.3d 1341 (9th Cir.1993), a case involving a § 1962(c) claim against an attorney who had been retained by an alleged RICO enterprise. The plaintiffs, purchasers of limited partnership interests, alleged that the attorney prepared letters to state officials "to forestall and cover-up the fraud by minimizing or mischaracterizing the allegedly improper activities" of the enterprise. *Id.* at 1342. That conduct was insufficient to establish liability under *Reves,* the Court found, because the attorney "at no time held any formal position in the partnership" and never played "any part in directing the affairs of the enterprise." *Id.* at 1344.

*Baumer* is one of many cases recognizing the difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because "the test is not involvement but control...." *A.I. Credit Corp. v. Hartford Computer Group, Inc.,* 847 F.Supp. 588, 601 (N.D.Ill.1994) .. The importance of control is illustrated by the one example specifically cited by the *Reves* majority to demonstrate control over a RICO enterprise by a person outside the enterprise: bribery. 507 U.S. at 184–85, 113 S.Ct. at 1173. Bribery is qualitatively different from mere influence or assistance because the outsider paying the bribes buys actual control over the actions of a person within the enterprise. Giving a bribe can be

tantamount to gaining a management position within the enterprise, because the insider taking the bribes acts under the direction of the outsider giving them in conducting the affairs of the RICO enterprise. *See generally United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.1994) (accountants in *Reves* were not liable because "while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command"), *cert. denied*, — U.S. —, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995). The Court's choice of bribery as an example of an act that might qualify as "operation or management" emphasizes how difficult it is to hold an outsider liable under § 1962(c) after *Reves*.

An outsider who merely enjoys "substantial persuasive power to induce management to take certain actions," *Morin*, 835 F.Supp. at 135 (citation omitted), unlike an outsider who bribes, does not exercise control over the enterprise within the meaning of *Reves*. Similarly, it is not enough to control even fraudulent activity that is ancillary to the fraud carried out by the RICO enterprise. That principle compelled dismissal in *De Wit v. Firstar Corp.*, 879 F.Supp. 947 (N.D.Iowa), *leave to replead granted in part*, 904 F.Supp. 1476 (N.D.Iowa 1995), where purchasers of interests in a cattle venture sued a financial institution which provided banking services to the venture. The venture was the alleged RICO enterprise. Citing *Reves*, the Court dismissed the claim because the plaintiffs

> have alleged only that defendants conducted [the] enterprises's banking scheme.... [D]efendants' conduct was one step removed from management of the RICO enterprise itself, and thus liability will not lie under § 1962(c).

879 F.Supp. at 965. The Court reasoned that "even provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise." *Id.* at 966.

## C.

One district court has held that an outside professional may participate in the operation or management of a RICO enterprise by knowingly concealing the fraudulent activities of the enterprise. In *Clark v. Milam*, 847 F.Supp. 409 (S.D.W.Va.), *recons. denied*, 872 F.Supp. 307 (S.D.W.Va.1994), the Court refused to dismiss a § 1962(c) claim against accountants who had performed allegedly deficient audits for a RICO enterprise. The plaintiffs alleged that the auditors "knowingly concealed the activity of other defendants who exercised day-to-day control over the enterprise," and that this concealment was "integral to the continuing operation of the RICO enterprise." 847 F.Supp. at 417. The complaint survived *Reves*, the Court decided, because

> the allegations of participation suggest that the Defendants did more than merely perform deficient work; it is alleged that they *knowingly* performed such work to protect other defendants by concealing those defendants' RICO violations from state insurance regulators.

*Id.* at 416 (emphasis in original). Under this interpretation of *Reves*, DED would appear to have a viable § 1962(c) claim.

For at least three reasons, I decline to follow *Clark*. First, *Clark* equates concealment of an enterprise's fraudulent activities with control over the affairs of the enterprise. The *Clark* Court reasoned that because the concealment was "integral to the continuing operation" of the enterprise, those who concealed the fraud controlled the enterprise. But it is difficult to see where the chain of control stops under that logic. An accountant's audit reports, or a lawyer's opinion letters, are always "integral to the continuing operation" of the enterprise in the sense that professional services are essential to the continued existence of a business. But so is the electricity supplied to the enterprise's offices, and it would be absurd to say that the public utility that provides the electricity participates in the operation or management of the enterprise. The *Clark* Court's "integral to the continuing operation" formulation thus seems at odds with the *Reves* requirement of "some part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179, 113 S.Ct. at 1170. The *Clark* test arguably would require *Reves* itself to be decided differently on its own facts, because Arthur

Young's conduct in *Reves* was "integral to the continuing operation" of the enterprise in the sense that the enterprise could not function without accountants. Moreover, the *Clark* logic runs afoul of the rule, uniformly applied by the lower courts that have reached the issue, that the provision of services—even essential services—to a RICO enterprise is not the same as controlling the enterprise's affairs. *See De Wit,* 879 F.Supp. at 966 n. 15 and cases cited therein.

*Clark* is one of a small handful of cases decided by district courts that seem to under-appreciate the requirement of "control" under *Reves.* Similarly troublesome language has appeared elsewhere. In *In re Phar–Mor, Inc. Secs. Litig.,* 893 F.Supp. 484 (W.D.Pa.1995), for example, the Court dismissed a post-*Reves* § 1962(c) claim against an accounting firm on the ground that the firm had not been a "knowing participant in the fraud." *Id.* at 488. By dismissing for failure to allege "knowing participation" in fraud, the Court invited the mistaken inference that *Reves* is satisfied simply by a claim of "knowing participation" in fraud. *See, e.g., Circle Business Credit, Inc. v. Becker,* No. Civ. A. 92–3177, 1994 WL 52848 (E.D.Pa. Feb. 18, 1994) (refusing to dismiss § 1962(c) claim; plaintiffs alleged that accountant "actively participated in the primary RICO violation by certifying financial statements that he knew were false or which he knew would be used to promote fraud"). That inference is logically invalid. Moreover, the "knowing participation" formulation is substantively flawed because it begs the question. The concept of "participation" standing alone and in the abstract is broader than the text-specific sense of "participation" used by the Supreme Court in *Reves* when it construed § 1962(c). *See National Org. for Women, Inc. v. Scheidler,* 897 F.Supp. 1047, 1071 n. 19 (N.D.Ill.1995) (stressing difference between dictionary definition of "participation" and meaning of "participation" under *Reves* ). One can "knowingly participate" in fraud without having "some part in directing the affairs of the enterprise." Thus, a "knowing participation" definition, without more, arguably reads the "control" requirement out of *Reves. Compare Felicetti,* 830 F.Supp. at 260 (knowing preparation of fraudulent audit

reports does not constitute "operation or management" under *Reves* ).

Second, language in *Clark* suggests that the Court conflated primary liability with aiding and abetting liability under § 1962(c). The Court prefaced its § 1962(c) analysis with the observation that there was no case law in the Fourth Circuit "addressing whether a claim of aiding and abetting a RICO violation is actionable." 847 F.Supp. at 416. The Court then applied *Reves* as though *Reves* set guidelines for aiding and abetting liability. As discussed below in Part IV.(6) of this opinion, I find that there can be no claim based on aiding and abetting a RICO violation in view of *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Moreover, the Court in *Reves* expressly held that "operating or managing" an enterprise within the meaning of § 1962(c) requires greater participation than aiding and abetting. *See Reves,* 507 U.S. at 178–80, 113 S.Ct. at 1170; *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 995 (E.D.N.Y.1995); *Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants,* 832 F.Supp. 585, 592 (E.D.N.Y.1993).

Third, the *Clark* Court relied on *Davis v. Mutual Life Ins. Co. of New York,* 6 F.3d 367 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994), a case that did not address the requirements for primary liability under § 1962(c) after *Reves.* The portion of the *Davis* opinion cited by the *Clark* Court dealt with vicarious liability; the *Davis* Court concerned itself with allocating responsibility between related parties after a primary violation of § 1962(c) by one defendant already had been established. 6 F.3d at 380.

### D.

*Reves* itself provides confirmation that DED's allegations are insufficient to establish "operation or management" under § 1962(c). As Justice Souter noted in his dissent, the *Reves* plaintiffs alleged that

Arthur Young created the very financial statements it was hired, and purported, to audit.... Arthur Young took on manage-

ment responsibilities by deciding, in the first instance, what value to assign to the Co-op's most important fixed asset . . . and Arthur Young conceded below that the alleged activity went beyond traditional auditing. . . .

Arthur Young did indeed step outside of its auditing shoes and into those of management, in creating the financial record on which the Co-op's solvency was erroneously predicated.

*Id.* at 188–92, 113 S.Ct. at 1175–76. DED's allegations are similar. DED charges that AA "creat[ed] the financial records and generat[ed] from them the financial statements it purported to audit," and that AA's conduct "reached far beyond the scope of its profession." (Pl.Mem. at 302, 298) As the *Reves* majority and many lower courts have recognized, these acts do not reflect control over the enterprise. At best, they establish assistance to the enterprise. *See, e.g., University of Maryland,* 996 F.2d at 1539 (defendant accountants did not control enterprise under *Reves* by attending board meetings, providing consulting services, helping to computerize internal accounting functions, and performing valuations necessary for asset sales and acquisitions); *Biofeedtrac,* 832 F.Supp. at 591 ("even when professionals go beyond their customary role, they will not be deemed to have participated in the 'operation or management' of the enterprise itself"); *Chamarac Properties, Inc. v. Pike,* No. 86 Civ. 7919, 1993 WL 427137, *3 (S.D.N.Y. Oct. 19, 1993) (accounting firm's professional misconduct and assumption of limited management responsibilities were insufficient to establish § 1962(c) liability).

I recognize and acknowledge the hazards of relying on a dissent to measure the breadth of a majority opinion. Nevertheless, the facts and allegations set forth by Justice Souter in his dissent were part of the record, and were deemed by the majority insufficient to establish liability under § 1962(c). The *Reves* majority did not simply adopt the new "operation or management test" and remand for its application. Rather, the Court determined as a matter of law that the facts in the record failed to establish Arthur Young's "operation or management" of the RICO enterprise. 507 U.S. at 186–88, 113 S.Ct. at 1174. Because that result necessarily means that these facts were insufficient to establish liability, it is appropriate to compare these facts to the facts alleged in the case at bar in order faithfully to apply the *Reves* standard.

The conclusion that AA did not participate in the operation or management of the DeLorean entities does not immunize AA altogether from liability. That conclusion bars recovery only under § 1962(c). DED may press its claims for the underlying securities fraud under Rule 10b–5, to the limited extent noted below in Part IV.(7)(b) of this opinion, and under state law, based on theories which do not require control over the issuer of the securities.

### E.

As explained above, § 1962(c) makes it unlawful for any "person" associated with an "enterprise" to participate in the affairs of that enterprise (within the meaning of *Reves* ) through a pattern of racketeering activity. Under DED's principal theory of liability, AA was the "person" and the DeLorean entities were the "enterprise." For the reasons stated above, that claim is untenable.

Apparently sensing what was to befall the theory underlying its First Amended Complaint, DED has loosed a torrent of alternative theories of § 1962(c) liability into its Second Amended Complaint and its Memorandum of Law. This continues a trend in which DED's § 1962(c) claim has undergone several metamorphoses over the past 10 years. I have been able to identify at least 15 different versions of the claim in DED's papers. The table below lists each different combination of "person" and "enterprise" DED has alleged in its Complaint, First Amended Complaint, Second Amended Complaint, and Memorandum of Law in Opposition to Summary Judgment:

| DOCUMENT | "PERSON" | "ENTERPRISE(S)" |
|---|---|---|
| (1) Compl. ¶ 140 | DeLorean & accomplices | DMC |

| DOCUMENT | "PERSON" | "ENTERPRISE(S)" |
| --- | --- | --- |
| (2) Compl. ¶ 140 | the partners and employees of AA | AA |
| (3) FAC ¶ 186 | Measelle, Massura, and Beckman | Measelle, Massura, and Beckman |
| (4) FAC ¶ 187 | Measelle, Massura, and Beckman | AA |
| (5) FAC ¶ 188 | Measelle, Massura, and Beckman | DeLorean & accomplices, DMC, DeLorean Mfg. Co.,[9] Logan Mfg. Co., and AA |
| (6) FAC ¶ 189 | AA–USA | AA |
| (7) FAC ¶ 190 | AA–USA | DeLorean & accomplices, DMC, DeLorean Mfg. Co, Logan Mfg. Co., and AA |
| (8) SAC ¶ 228 | Measelle, Massura, Francis Barrett (a partner at AA's Dublin office), and Ian Hay Davison (the managing partner of AA's London office) | DeLorean & accomplices, DMC, DeLorean Mfg. Co., Logan Mfg. Co., CRISTINA,[10] Gotaru Co. S.A.,[11] AA, Measelle, Massura, Barrett, Beckman, and Davison |
| (9) SAC ¶ 229 | Measelle, Massura, Barrett, and Davison | AA |
| (10) SAC ¶ 230 | Measelle, Massura, Barrett, Davison | DeLorean & accomplices, DMC, DeLorean Mfg. Co., Logan Mfg. Co., and AA |
| (11) SAC ¶ 231 | AA–USA | AA |
| (12) SAC ¶ 232 | AA–USA | DeLorean & accomplices, DMC, DeLorean Mfg. Co., Logan, and AA |
| (13) Pl.Mem. at 340 | AA and/or Measelle, Massura, Barrett, and Davison | Measelle, Massura, Barrett, and Davison |
| (14) Pl.Mem. at 340 | AA and/or Measelle, Massura, Barrett, and Davison | AA, the DeLorean entities, and the Lotus entities |
| (15) Pl.Mem. at 340 | AA and/or Measelle, Massura, Barrett, and Davison | AA–USA, AA–UK, and AA–Ireland |

**9.** DeLorean Manufacturing Company was the successor to the John Z. DeLorean Corporation. (SAC ¶ 18(c))

**10.** CRISTINA was a Nevada corporation owned and controlled by DeLorean and apparently named after his then-wife, the former Cristina Ferrare. CRISTINA held all of the capital stock of DeLorean Manufacturing Company after October 17, 1979. (SAC ¶ 18(c))

**11.** Gotaru was a Liberian corporation owned and controlled by DeLorean. DED alleges that Gotaru held the net proceeds of the GPD escrow account after September 18, 1979. (Pl.Mem. at 347–48 n. 267)

Theories (1) through (7) have been superseded. The gist of theories (8), (10), and (12) is that AA, through its partners and employees, participated in the operation or management of one or more of the entities controlled by DeLorean. That argument was rejected above.

Theories (9), (11), (13), and (15) may be disposed of together. In each, DED alleges that the partners and employees of AA or AA itself participated in the operation or management of (a) one or more AA-affiliated entities or (b) an association in fact of AA partners and employees. Under RICO, "the person and the enterprise referred to must be distinct." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994); *cf. Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984) (parent corporation and wholly-owned subsidiary can not conspire to restrain trade in violation of Sherman Act). The *Riverwoods* Court explained that

> by virtue of the distinctness requirement, a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c). This does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself. In this regard we have noted that a section 1962(c) claim may be sustained where there is only a partial overlap between the RICO person and the RICO enterprise, and that a defendant may be a RICO "person" and one of a number of members of the RICO "enterprise." Nevertheless, by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented.

*Id.* (citations and quotation marks omitted).

Under theories (9), (11), (13), and (15), DED asserts various permutations of AA entities and AA partners and employees as persons and enterprises. Liability in each case is premised on accounting work and related services performed by partners and employees in the course of AA's "regular affairs" as a major accounting firm. Under theory (15), DED alleges two AA entities as person and enterprise, but this does not change the result. Even if AA observes administrative separation, *see* 683 F.Supp. at 1468 n. 1, AA's different geographical units still perform the same "regular affairs" of AA's accounting business. Accordingly, all of these theories fail the distinctness test.

That leaves theory (14). That theory survives the distinctness requirement because the alleged enterprise includes the "Lotus RICO persons"—including Lotus Chairman Colin Chapman, charged by DED with fraud in connection with the GPD contract—who are distinct from AA. However, summary judgment nevertheless is warranted rejecting that theory because it has no evidentiary support. The theory is conjured for the first time on page 346 of DED's Memorandum of Law. DED there explains that "[w]hile the DeLorean and Chapman groups planned and executed the misappropriation of funds, the AA RICO persons were responsible for developing and executing steps to conceal the fraud and misrepresent the facts, AA's knowledge, and AA's conduct as auditors and otherwise." DED overlooks that assertions in legal memoranda are not evidence, *Ortiz v. Regan,* 749 F.Supp. 1254, 1263 (S.D.N.Y.1990), and apparently seeks to create an atmosphere conducive to imagining the requisite association in fact and scheme of participation in the association by the RICO person. This atmosphere permeates the breathtakingly imaginative story in the 187–page introduction to DED's Memorandum of Law, but DED's effort is wasted on me; I simply don't see it. I find DED's supporting explanations confusing—largely because a dizzying array of conflicting theories are bandied about in the Memorandum—and unsupported by facts. A bare

allegation will not suffice on a motion for summary judgment, especially when the allegation appears for the first time 10 years, and three complaints, after the action was filed.

### (5) *Section 1962(d) (RICO)*

■ DED has alleged that AA conspired to commit RICO violations in violation of § 1962(d). A defendant who is incapable of committing a RICO violation nevertheless may be liable for a RICO conspiracy. *United States v. Goldberg,* 756 F.2d 949, 958 (2d Cir.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985). AA challenges the claim principally on the ground that DED has produced no proof of any agreement to commit a pattern of predicate racketeering acts.

"Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, the complaint must allege such an agreement." *Morin v. Trupin,* 832 F.Supp. 93, 99 (S.D.N.Y.1993). Judge Stewart dismissed the § 1962(d) claim asserted in the original complaint because DED "alleged no facts tending to show an agreement between DeLorean and defendants to commit predicate acts." 683 F.Supp. at 1482. In the First Amended Complaint filed soon after the dismissal, DED did not assert any claim under § 1962(d).

Without bothering to seek leave to replead under § 1962(d), DED revived its conspiracy claim in the 1994 Second Amended Complaint, perhaps to take the place of a § 1962(c) claim doomed by *Reves.* Determined not to lose on pleading grounds, DED has crammed the Second Amended Complaint to the margins with allegations of conspiracy. By AA's count, the word "conspiracy" or "conspired" appears over 130 times in the Second Amended Complaint. (Def.Mem. at 149) However, on a motion for summary judgment, it is not enough merely to allege.

■ DED points to no direct evidence in the voluminous record in this case of any agreement between DeLorean and members of AA to commit predicate acts of securities fraud or mail fraud. Instead, DED merely recites all the misconduct upon which its underlying securities fraud claim is based and then leaps boldly to the conclusion that the described activity simply must be the product of a conspiracy. Although conspiracies often must be proved by circumstantial evidence, *see, e.g., United States v. Amato,* 15 F.3d 230, 235 (2d Cir.1994), I find that the inferences required to support a coherent conspiracy claim cannot reasonably be drawn from the evidence here.

DED devotes several pages of its Memorandum of Law to a tortured explanation of the alleged conspiracy. The story goes something like this: Once upon a time DeLorean planned to raise $11 million in surplus funds through the DRLP offering. In phase one of the conspiracy, DeLorean secured the help of Measelle and Massura who issued a tax report in connection with the offering. In phase two, DeLorean developed a plan to use the money to acquire Lotus instead of using the money for the benefit of DMC. At this point, the conspiracy was joined by Chapman and Frederick Bushell of Lotus, and AA helped solicit financing to construct a manufacturing facility. In phase three, DeLorean, Chapman, and Bushell suddenly "modified their plan to a straightforward theft" and agreed to misappropriate the money using GPD as a vehicle for embezzlement. AA learned of these plans and ratified them by failing to withdraw from the conspiracy. At this juncture, DED turns from amateur sleuth to amateur psychoanalyst, explaining that Barrett "reluctantly" joined the conspiracy. In phase four, DeLorean used the misappropriated funds to buy Logan through a series of "complex and secret" transactions. (Pl.Mem. at 347–57)

According to DED, this was a "wheel" conspiracy. *See, e.g., United States v. Zabare,* 871 F.2d 282, 288 (2d Cir.), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). DeLorean was the "hub" of the wheel, and spokes of agreement flared out from him in every direction to Measelle, Massura, Barrett, Davison, Chapman, Bushell, Marie–Denise Juhan (the Swiss agent for GPD), and Thomas Kimmerly (DeLorean's personal attorney), among others. In this type of conspiracy, the persons at the end of each spoke are not necessarily aware

of the role of co-conspirators at the ends of other spokes. (Pl.Mem. at 348–51)

DED's Memorandum goes on wondrously, but it is naked of evidence tending to establish the alleged DeLorean–AA agreement "spoke" of the wheel. DED has identified several alleged examples of AA's participation in the alleged conspiracy, but none of the cited evidence fairly supports an inference that DeLorean and AA agreed to commit RICO predicate acts.

First, DED points to the June 1978 research and development projections. DED alleges that the expenditure estimates were inflated, and that the amount of the inflation was the sum DeLorean planned to misappropriate. DED argues that because AA's accountants were experienced and sophisticated, the error in the projections could not have been inadvertent and more likely was the product of an agreement with DeLorean to steal money. (Pl.Mem. at 368–69) As discussed previously, *see* Part IV.(1)(a) *supra*, that story makes no sense. It is impossible to understand why anyone would create an $11 million discrepancy on a financial statement in order to hide a plan to steal. If anything, such a discrepancy would draw attention to the plan. Further, DED again glosses over the fact that the projections were based on information generated by DMC for the DRLP private placement memorandum. Given AA's minimal involvement in the formulation of the projections, there is no basis to make either of the bold inferential leaps DED urges: (1) that AA knew there was a glaring error in the projections, or (2) that the error was the by-product of an agreement to steal from DMCL in the future.

Second, DED cites AA's participation in DeLorean's negotiations with NIDA and DOC in June and July 1978 leading up to the signing of the Master Agreement. (Pl.Mem. at 372) DED again relies on AA's minimal involvement in the preparation of the projections, as well as on the July 1, 1978 meeting between Measelle and NIDA and DOC representatives. DED argues that because Measelle "had nothing but praise for DeLorean's managerial talents and the company's prospects" at this early stage of the project,

there must have been a conspiracy between DeLorean and Measelle. As above, that conclusion can be drawn from the facts only through a hyperactive imagination which no reasonable fact-finder would indulge.

Third, DED alleges that Measelle and others at AA learned in fall 1978 that DeLorean planned to acquire Lotus and/or retain engineering assistance from Lotus through the GPD contract. DED has supplied a lengthy description of DeLorean's elaborate plan of misappropriation (Pl.Mem. at 377–81), but there is little mention of what AA did at this point. Presumably, DED argues that AA did nothing, and this inaction proves that AA agreed with DeLorean to commit fraud. Again, the inference simply does not reasonably follow from the circumstantial evidence.

Fourth, AA surmises—again without any evidentiary support—that Measelle and Massura "had to have been alarmed" when they saw the GPD contract that AA would be sued for its role in a money laundering arrangement. (Pl.Mem. at 381) AA's failure to resign or expose the fraud, DED argues, suggests that AA had agreed with DeLorean to "go through the motions of an audit, taking pains to avoid looking below the surface." (Pl.Mem. at 384) As discussed above in Part IV.(1)(b) of this opinion, there remains an issue of fact as to the quality of AA's audits in this case. But these allegations provide no new evidence of an agreement. Here, DED serenely assumes the truth of the proposition it is trying to prove—that AA was fully aware of the details of a money laundering scheme—and uses that as a springboard for the equally unsupported assertion that AA was in cahoots with DeLorean. DED also alleges that in early 1979, AA expressed concerns—both internally and to DeLorean—about the unusual structure of the GPD contract. (Pl.Mem. at 385–94) But that only suggests that AA was unaware of what DeLorean was plotting, and therefore cuts against the existence of an agreement.

Shifting gears, DED simultaneously presses the alternative argument that AA was not aware of fraud in connection with the GPD contract, but consciously avoided discovering it by asking insufficiently probing questions. (Pl.Mem. at 363–65, arguing, by analogy to

criminal cases, that conscious avoidance of knowledge is the equivalent of knowledge). However, DED has failed to produce evidence that anyone at AA consciously ignored suspicious irregularities, and DED is asking the court to make two substantial and unwarranted inferential leaps, not only from conscious avoidance to knowledge, but also from knowledge to agreement.

Fifth, DED argues that AA's failure to investigate allegations by DMC's financial officers proves that AA conspired with DeLorean. On November 8, 1979, Walter Strycker, DMC's Chief Financial Officer, and Harry DeWit, DMC's Director of Accounting, allegedly met with Measelle and Massura in New York. DED claims that Strycker and DeWit voiced "suspicions of DeLorean's dishonesty in connection with a Swiss loan...." (Pl. Mem. at 395) Strycker and DeWit allegedly announced that the proceeds of the loan had been "used by DeLorean to pay off the loan from Continental Bank that DeLorean had used to acquire Logan Manufacturing." (*Id.*) DED alleges that Measelle expressed concern and promised to conduct an inquiry, but designed the inquiry so as "to conceal rather than to expose." (Pl.Mem. at 397) DED charges that Measelle assigned Richard Beckman to review the loan agreement, knowing that Beckman was "compliant," and did not tell Beckman of the suspicions articulated by Strycker and DeWit. Finally, DED contends that AA did not sufficiently press Kimmerly for further explanations when Kimmerly denied Beckman and Massura access to certain loan documents. (*Id.*)

AA flatly denies that Strycker and DeWit communicated any suspicions to Measelle. (Def.Mem. at 56)

Resolving the credibility dispute in favor of DED, as I must on this motion, there is still no evidence to support the inference of an agreement. At worst, the above allegations suggest sloppy auditing and insufficiently probing scrutiny. If that resulted in the later issuance of reports containing false representations, then DED may have a valid claim for fraud or negligence. But conspiracy is another matter entirely. As with the rest of the evidence DED has marshalled in support of the § 1962(d) claim, these facts do not fairly lead to the inference that AA agreed with DeLorean to commit or conceal fraud.

Sixth, DED alleges that all of AA's audit reports and capital grant certificates issued subsequent to November 1979 were part of the conspiracy. In a familiar pattern, DED argues as follows: (1) AA's reports were silent as to irregularities. (2) AA either specifically knew of the fraud DeLorean was perpetrating, or generally knew that DeLorean was committing fraud but consciously avoided discovering the details. (3) Because AA knew of the fraud, AA not only participated in the fraud but also agreed with DeLorean beforehand to commit the fraud. This argument simply is unsupported by facts and evidence. Proposition (1) arguably may be true, but as explained above, this suggests only that DED may be able to prove that AA made false representations. Meanwhile, propositions (2) and (3), the parts of the argument that do all the work, are nothing but airy speculation. That is not enough to defeat a motion for summary judgment.

In place of evidence, DED has offered only increasingly vehement allegations and circular references to other parts of its Memorandum of Law or to its complaint. DED's submissions betray fundamental misunderstanding of (a) what it means to say that an inference supports DED's position, (b) what constitutes circumstantial evidence, and (c) what even willful ignorance can prove and what it cannot prove in a conspiracy case. An inference that supports DED's position is a logical conclusion drawn from facts interpreted in the light most favorable to DED, not a guess that is merely consistent with such facts. Circumstantial evidence is evidence that tends to prove a disputed fact whose existence follows inferentially from the existence of evidentiary facts; it is not merely evidence that is as consistent with the fact sought to be proved as with its opposite. *See United States v. Giovannetti*, 919 F.2d 1223, 1227–29 (7th Cir.1990) (Posner, J.) (describing in a criminal case what inferences may be drawn from ignorance in different circumstances when the charge is aiding and abetting). Finally, willful ignorance may be used

to prove knowledge of the particular goals of a conspiracy, but it may not be used to prove membership in a conspiracy simply because it is impossible to infer that a defendant joined a conspiracy of whose existence he was ignorant. *United States v. Lanza,* 790 F.2d 1015, 1022–23 (2d Cir.), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986); *United States v. Mankani,* 738 F.2d 538, 547 n. 1 (2d Cir.1984).

Because the facts and evidence DED has proffered do not fairly support the *inference* that DeLorean and AA agreed to commit RICO predicate acts, as opposed to being merely consistent at times with that possibility, AA is entitled to summary judgment on the § 1962(d) claim.

#### (6) *Aiding and Abetting RICO Violations*

AA argues that DED's claim for aiding and abetting a RICO violation must be dismissed because there is no such tort. AA relies on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, ——, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994).

In *Central Bank,* the Supreme Court held that there can be no private civil liability for aiding and abetting securities fraud under Section 10(b) of the 1934 Act and Rule 10b–5. *Id.* at ——, 114 S.Ct. at 1455. The Court stressed that "the text of the statute controls our decision," *id.* at ——, 114 S.Ct. at 1446, and that "Congress knew how to impose aiding and abetting liability when it chose to do so." *Id.* at ——, 114 S.Ct. at 1448. The Court observed that "the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation," and concluded that this ends the analysis. *Id.* The Court rejected the plaintiff's argument that liability for aiding and abetting could be inferred under general principles of tort law. On the contrary, the Court explained,

> Congress has not enacted a general civil aiding and abetting statute.... [W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the violation of some statutory norm, there is no general

presumption that the plaintiff may also sue aiders and abettors.

*Id.* at —— – ——, 114 S.Ct. at 1450–51.

AA argues that under *Central Bank's* approach to statutory construction, the court must conclude that there is no civil aiding and abetting liability under RICO. I agree.

RICO is codified in Title 18 of the United States Code, the home title of statutes imposing criminal liability. Section 1962 describes the primary conduct that is prohibited under RICO. Section 1964(c) establishes a civil remedy in favor of "[a]ny person injured in his business or property by reason of a violation of section 1962" and provides for treble damages and attorney's fees for prevailing plaintiffs.

The starting point for the analysis, as always, must be the text of the statute. The three subsections of § 1962 upon which DED premises liability do not mention aiding and abetting liability. Section 1962(a) makes it unlawful to invest income derived from participation in a pattern of racketeering activity in an enterprise engaged in interstate commerce. The text of the statute provides that participation in racketeering activity for purposes of the subsection is governed by 18 U.S.C. § 2. Section 2 generally provides that those who aid and abet the commission of "an offense against the United States"—that is, a crime—are punishable under federal criminal law as principals.

Thus, one can commit a primary civil violation of § 1962(a) if one has aided and abetted racketeering activity. But this does not mean that someone who aids and abets another person's violation of § 1962(a) is liable to private parties for damages. Section 1962(a) incorporates the general criminal aiding and abetting statute only for purposes of defining the predicate activity—"participation" in a racketeering enterprise—upon which that subsection's prohibition of investing income is based. That reference to § 2 does not create private civil liability for aiding and abetting a primary violation of § 1962.

Section 1962(b) prohibits the acquisition or maintenance through a pattern of racketeer-

ing activity of an interest in or control of an enterprise engaged in interstate commerce. Section 1962(c), as discussed extensively above, prohibits participation in the conduct of an enterprise's affairs through a pattern of racketeering activity. Neither provision mentions aiding and abetting.

Like the Court in *Central Bank,* I find no reason to go beyond the text of the statute. DED, like the plaintiff in *Central Bank,* cannot invoke a general federal civil aiding and abetting statute because there is no such statute. Further, the proposition that Congress knows how to impose secondary liability when it chooses to do so rings particularly true here. As explained above, the reference in § 1962(a) to 18 U.S.C. § 2 demonstrates that Congress was aware of the significance of aiding and abetting and the difference between primary and secondary liability. Moreover, the establishment of liability for conspiracies to commit RICO violations in § 1962(d) shows that Congress knew how to impose inchoate liability, which, like aiding and abetting liability, involves conduct that is conceptually removed from "primary" wrongdoing. Given the text of the statute, and given that the RICO civil action (unlike the private right of action addressed in *Central Bank* ) was expressly created by the statute, there is no reason to believe that the omission of language in RICO covering aiders and abettors was inadvertent. Arguably, the case for recognizing implied forms of liability was stronger under the Rule 10b–5 claim at issue in *Central Bank* because of the Supreme Court's holding the previous term in *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993). In that case, the Court reiterated its general reluctance to recognize new implied rights of action. *Id.* at 290–92, 113 S.Ct. at 2088. However, the Court was less reluctant to craft implied remedies under Rule 10b–5, because the Court was not writing on a clean slate. "Having implied the underlying liability in the first place," the Court explained, "to now disavow any authority to allocate it on the theory that Congress has not addressed the issue would be most unfair to those against whom damages are assessed." *Id.* No such argument supports judicial intervention under RICO.

It would be particularly troublesome to infer aiding and abetting liability in a case such as the present one, where most of the predicate acts upon which the RICO claims are based are acts of securities fraud. Plaintiffs could circumvent *Central Bank* by pleading that a defendant aided and abetted a pattern of Rule 10b–5 violations. *Cf. Bowdoin Constr. Corp. v. Rhode Island Hosp. Trust Nat'l Bank,* 869 F.Supp. 1004, 1009 (D.Mass.1994) ("any allegations of aiding and abetting securities fraud cannot constitute predicate acts under RICO. To hold otherwise would enable plaintiffs to use RICO to circumvent the interpreted intent of the Securities Act").

DED also makes the following argument: (1) 18 U.S.C. § 2 generally creates federal criminal aiding and abetting liability. (2) Section 1964(c) creates a civil remedy for criminal violations of § 1962. (3) Therefore, there is a *civil* cause of action for damages for the *criminal* act of aiding and abetting a violation of § 1962.

DED misunderstands the relationship of § 2 to the rest of Title 18. Section 2 merely states that those who aid and abet others who commit federal crimes are criminally liable as principals. Section 2 takes effect only in combination with some other provision creating primary criminal liability. Section 2 has no application to § 1964(c), the provision that creates the civil RICO action, because a violation of § 1964(c) is not "an offense against the United States" within the meaning of § 2. *See generally* Jed S. Rakoff, *Aiding and Abetting Under Civil RICO,* N.Y.L.J., May 12, 1994, at 3 ("there is no suggestion that § 2, enacted in 1909, was intended to authorize civil liability for aiding and abetting in any situation in which Congress thereafter combined civil and criminal penalties in one statute, whether in RICO (enacted in 1970), the Securities Exchange Act (enacted in 1934), or elsewhere").

Moreover, DED's understanding as to the operation of 18 U.S.C. § 2 seemingly would require *Central Bank* itself to have been decided differently. Under Section 32 of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff, persons who willfully violate any pro-

vision of the 1934 Act incur felony criminal liability. 18 U.S.C. § 2 applies to criminal Section 10(b) violations, as it does generally to all federal crimes. But § 2 cannot be interpreted to create liability for aiding and abetting under the parallel civil § 10(b) action, because *Central Bank* expressly holds that there is no such liability. It follows that criminal RICO's parallel civil action, 18 U.S.C. § 1964(c), should not be read to apply to aiders and abettors by operation of 18 U.S.C. § 2. This conclusion is consistent with the Court's specific admonition in *Central Bank* against reliance on 18 U.S.C. § 2 in recognizing private civil liability for aiding and abetting:

> [W]hile it is true that an aider and abettor of a criminal violation of any provision of the 1934 Act, including § 10(b), violates 18 U.S.C. § 2, it does not follow that a private civil aiding and abetting cause of action must exist.... If we were to rely on this reasoning now, we would be obliged to hold that a private right of action exists for every provision of the 1934 Act, for it is a criminal violation to violate any of its provisions. 15 U.S.C. § 78ff. And thus, given 18 U.S.C. § 2, we would also have to hold that a civil aiding and abetting cause of action is available for every provision of the Act. There would be no logical stopping point to this line of reasoning....

511 U.S. at ——, 114 S.Ct. at 1455. *See also* Alan R. Bromberg, *Aiding and Abetting: Sudden Death and Possible Resurrection,* Sec. & Commodities Reg., vol. 27, no. 14, at 139 (Aug.1994) ("*Central Bank* probably bars a claim of aid-abetting a RICO violation").

Several courts have expressly or implicitly recognized civil liability for aiding and abetting a RICO violation, but usually without much discussion of whether RICO imposes such liability. *See, e.g., Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1410 (11th Cir.), *modified on other grounds,* 30 F.3d 1347 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *U.S. v. Rastelli,* 870 F.2d 822, 832 (2d Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1356 (3d Cir.1987); *Armco Indus.*

*Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 485–86 (5th Cir.1986); *Laterza v. American Broadcasting Co.,* 581 F.Supp. 408, 412 (S.D.N.Y.1984). However, all of the above-cited cases were decided before *Central Bank* was decided in April 1994. In fact, before *Central Bank* was handed down, 11 different Circuits had recognized a private right of action for aiding and abetting securities fraud under Rule 10b–5. *See Central Bank,* 511 U.S. at ——, 114 S.Ct. at 1456 (Stevens, J., dissenting).

A Third Circuit panel recently affirmed prior holdings recognizing aiding and abetting liability under RICO, but did not consider whether *Central Bank* called those holdings into question. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 270 (3d Cir.1995). In the post-*Central Bank* decision *Succession of Wardlaw v. Whitney Nat'l Bank,* No. 94–2026, 1994 WL 577442, *7 (E.D.La. Oct. 17, 1994), the Court expressed reluctance to conclude "in the absence of guidance from higher courts" that *Central Bank* foreclosed aiding and abetting liability under RICO. The Court instead rested its dismissal of the aiding and abetting claim on the plaintiff's failure to allege facts tending to show "shared criminal intent." To the extent either of these holdings may be inconsistent with the reasoning above, I respectfully decline to follow them. AA is entitled to summary judgment on the claim for aiding and abetting a RICO violation because there is no such federal tort.

### (7) *Rule 10b–5*

 Rule 10b–5 provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1995). To recover under Rule 10b–5, a plaintiff must prove: (1) a false or misleading statement or omission, (2) scienter or recklessness, (3) reliance, and (4) loss causation. *Citibank, N.A. v. K–H*

*Corporation,* 968 F.2d 1489, 1494–95 (2d Cir. 1992).

### (a) *The Master Agreement*

For the reasons set forth above in Part IV.(1)(a) of this opinion and in Judge Stewart's 1988 ruling, 683 F.Supp. at 1474–76, DED's Rule 10b–5 claim is barred with respect to funds committed pursuant to the Master Agreement because AA made no relevant representations to NIDA and DOC "in connection with" the purchase of DMCL preferred shares pursuant to the Master Agreement.

### (b) *Post–Master Agreement Investment Decisions*

On March 12, 1980, the parties to the Master Agreement renegotiated the terms of the NIDA put. Under paragraph 9.2 of the original Master Agreement (Zirin Aff. Ex 49 at 133), NIDA was entitled after four years to force DMC to purchase NIDA's DMCL shares at a price equal to the value of 6.5 million shares of DMC stock. After 10 years, NIDA could force DMC to purchase the shares at a price of £1 per share plus a premium dependent on prior royalty payments. After the March 1980 amendment, NIDA enjoyed the single right, exercisable after four years, to exchange its DMCL shares for 7 million shares of DMC common stock. (Schade Aff.Ex. 305) NIDA relinquished the cash put option it would have enjoyed after 10 years under the original agreement. AA argues that the modification of the NIDA put was not a new purchase of a security for purposes of liability under Rule 10b–5.

 An amendment to an agreement to purchase securities will be deemed a new purchase of a security for purposes of Rule 10b–5's "in connection with the purchase or sale" requirement if the amendment produces "such significant change in the nature of the investment risks as to amount to a new investment." *Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). Applying that standard, which itself is somewhat circular, Judge Stewart denied summary judgment on this issue in his 1988 ruling, reasoning as follows:

> Since the value of DMC stock could fluctuate, NIDA could conceivably have received less [under the amendment] than it would have under the compensation formula in the original paragraph 9.2. It is true that even under the original paragraph 9.2, DMC's ability to pay for NIDA's DMCL stock was dependent on DMC's financial health—and ultimately upon the value of DMC's shares.... However, under paragraph 9.2 as originally written, NIDA at least had a contractual right to a specific amount of money which it could pursue in court, for example, through attachment of DMC's assets. Under the 1980 amendment, NIDA simply had the right to exchange its DMCL stock for a fixed amount of DMC stock—whatever that stock's value.
>
> It appears that by relinquishing its right to receive a cash payment for its shares of DMCL stock, NIDA further wedded itself to the financial fortunes of the U.S. parent company, and increased its investment risk.

683 F.Supp. at 1477.

AA does not assert new arguments or offer new evidence not considered by Judge Stewart. Moreover, there is evidence that with the amendment, NIDA surrendered a right valued at $50 million. *See* Hopkins Telex, Mar. 5, 1980, ¶ (1)(B), Schade Aff.Ex. 304 at 21002171. Because there remains, at a minimum, an issue of fact as to whether the amendment produced a "significant change in the nature of the investment risks," summary judgment is again denied. If DED prevails on this issue at trial and proves that NIDA and DOC relied on material misrepresentations knowingly issued by AA "in connection with" the amendment, DED may recover under Rule 10b–5.

DED argues also that a September 1978 amendment to the Master Agreement, and amendments in April and October 1979 to DOC's "Letter of Offer," also constituted new purchases of a security. (Pl.Mem. at 259–65) Because AA has not specifically addressed these amendments in its memoranda of law, summary judgment also is denied as

to whether the amendments were new investment decisions for purposes of Rule 10b–5.

### (8) *Negligence—Privity*

AA challenges DED's common law negligence claim in two ways. First, AA argues that the claim must fail on its merits because NIDA and DOC did not maintain the near-privity relationship with AA required for recovery under New York law. DED claims that NIDA and DOC did maintain such a relationship.

Both parties base their arguments on New York law. DED suggests in a footnote in its Memorandum of Law that "Michigan law should apply to plaintiff's negligence claims to the extent they are based on defendants' conduct in Michigan." (Pl.Mem. at 426) "Michigan jurisprudence has eliminated the defense of lack of privity in certain professional negligence cases and has adopted a rule of liability to foreseeable relying third parties." *Mieras v. DeBona,* 204 Mich.App. 703, 516 N.W.2d 154, 157 (1994), *leave to appeal granted,* 448 Mich. 930, 534 N.W.2d 520 (1995). Because I find that DED's claim survives summary judgment under the stricter New York standards applied below, it is not necessary at this time to decide the choice-of-law issue.

The leading New York case in this area is *Ultramares Corp. v. Touche, Niven & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931). In *Ultramares,* a creditor of a bankrupt rubber dealer sued the dealer's accountants for negligence in the preparation of an audit report misrepresenting the dealer as solvent. The New York Court of Appeals, in an opinion by Chief Judge Cardozo, held that accountants could be sued for negligence under these circumstances only if the accountants maintained with the creditor a relationship "so close as to approach that of privity, if not completely one with it." 255 N.Y. at 182–83, 174 N.E. at 446. The Court distinguished *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), where the Court of Appeals had held that a purchaser of beans could recover for negligence from public weighers retained by the seller to certify the weight of the beans purchased. Cardozo explained that in *Glanzer,* the use of the third party's services by the buyer was the "end and aim of the transaction"; the weigher's services were only "incidentally or collaterally" for the benefit of the seller. *Ultramares,* 255 N.Y. at 182–83, 174 N.E. at 445–46. Chief Judge Cardozo refused in *Ultramares* to recognize a duty "to the indeterminate class of persons who, presently or in the future, might deal with the [audit client] in reliance on the audit" absent some direct link between the third party and the accountants. *Id.*

The Court of Appeals reaffirmed *Ultramares* and clarified the law in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110, *amended on other grounds,* 66 N.Y.2d 812, 498 N.Y.S.2d 362, 489 N.E.2d 249 (1985). The *Credit Alliance* Court adopted a three-part test for accountants' liability in negligence to third parties:

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or party's reliance.

65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118.

In a companion case considered in the same opinion, *European American Bank & Trust Co. v. Strauhs & Kaye,* the Court found these requirements satisfied when the accountants "knew the identity of the specific nonprivy party who would be relying on the audit reports" as well as the purpose for the reliance. 65 N.Y.2d at 553, 493 N.Y.S.2d at 445. It had been alleged that the plaintiff and the accountants "remained in direct communication, both orally and in writing, and indeed met together throughout the course of [the] lending relationship with [the audit client] for the very purpose of discussing the [audit client's] financial condition." 65 N.Y.2d at 554, 493 N.Y.S.2d at 445.

The Court of Appeals revisited the issue of linking conduct in *Security Pacific Business Credit v. Peat Marwick Main & Co.,* 79

N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080, *reargument denied,* 80 N.Y.2d 918, 589 N.Y.S.2d 302, 602 N.E.2d 1118 (1992). In that case, the sole direct third party-auditor contact was a single unsolicited telephone call from the plaintiff to the auditor during which the plaintiff third party asked the auditor a single question about an audit report. The Court found that insufficient to establish the link required by *Credit Alliance.* 79 N.Y.2d at 706, 586 N.Y.S.2d at 92–93, 597 N.E.2d at 1085–86. The Court distinguished *European American Bank* as a case involving accountants who had "multiple, direct, and substantive communications and personal meetings with the relying lender during the entire course of the lending relationship." 79 N.Y.2d at 705, 586 N.Y.S.2d at 92, 597 N.E.2d at 1085. The Court also deemed it significant that there was no evidence indicating that the accountant "shaped its [ ] audit opinion to meet any needs of [the relying lender]." 79 N.Y.2d at 706, 586 N.Y.S.2d at 93, 597 N.E.2d at 1086.

█ Construing the facts in the light most favorable to DED, I find that this case is closer to *European American Bank* than to *Security Pacific.* As to the first two parts of the *Credit Alliance* test, there is at least an issue of fact. Correspondence produced in discovery suggests that AA knew of the existence and role of NIDA and DOC in the affairs of its audit client, and that AA knew that NIDA and DOC were relying on AA's audit reports in order to monitor their investments in DMCL. *See, e.g.,* Letter from Barrett to Strycker, Dec. 14, 1978, Schade Aff.Ex. 420 ¶ 4(c) ("You indicated to us . . . that it would be desirable to have [a separate] audit report prepared . . . on [DMCL] so that this could be given to NIDA and the Department of Commerce to indicate clearly how the project is progressing to date").

Further, there is substantial evidence that AA took affirmative steps to forge links with NIDA and DOC, as is required under the third part of the *Credit Alliance* test. For example, even before the Master Agreement was signed, AA officials participated in negotiations conducted on June 19 and 20, 1978 between DeLorean and NIDA and DOC, on the subject of the DMCL venture. *See*

McGhee Mem., Schade Aff.Ex. 9 at 1 ("On the 19th and 20th of June Lochlann Quinn and I participated in negotiations between [DMC], [DOC] and [NIDA] relating to the proposed establishment by DeLorean of a manufacturing plant in Northern Ireland"). Similarly, Francis Barrett of AA's Dublin office sent Harte, who was one of the NIDA-appointed directors of DMC, a copy of his December 14, 1978 letter to Strycker stressing the need to provide financial information to NIDA and DOC. Barrett stated at his deposition that he did this because "[Harte] was very active . . . in all aspects of the company at the time, and I wanted to keep him informed." Barrett Dep., Schade Aff. Ex. 37 p. 317. In addition, direct contact between AA personnel and NIDA representatives occurred regularly at the DMC audit committee meetings where AA officials presented audit reports to an audience known to include NIDA-nominated directors.

In *Ultramares,* Chief Judge Cardozo expressed fear of an onslaught of suits against accountants by a potentially limitless "indeterminate class of persons who . . . might deal with the [audit client]." 255 N.Y. at 183, 174 N.E. at 445–46. That concern is not engaged here. AA was retained by a start-up company bankrolled primarily by a single large investor. The linking conduct identified above, if not rebutted, firmly establishes AA's appreciation of the significant role NIDA and DOC played in the affairs of DMCL, as well as AA's awareness that NIDA and DOC would be relying on AA's audit reports. At the very least, DED has raised a genuine issue of material fact as to the existence of contacts sufficient to establish the near-privity relationship required under *Ultramares* and *Credit Alliance.* Accordingly, summary judgment on the negligence claim is not warranted on this ground.

### (9) *Negligence—Statute of Limitations*

AA's second challenge to DED's negligence claim is based on the statute of limitations. New York negligence actions must be commenced within three years of the negligently caused injury. N.Y.Civ.Prac.L. & R. § 214(5) (McKinney 1990). DED filed this action on February 15, 1985. (Compl. at 103)

Under New York law, "[i]n the context of a malpractice action against an accountant, the claim accrues upon the client's receipt of the accountant's work product since this is the point that a client reasonably relies on the accountant's skill and advice...." *Ackerman v. Price Waterhouse,* 84 N.Y.2d 535, 541, 620 N.Y.S.2d 318, 321, 644 N.E.2d 1009, 1012 (1994), *mot. to amend denied,* 85 N.Y.2d 836, 624 N.Y.S.2d 364, 648 N.E.2d 783 (1995). The *Ackerman* case involved a suit by the audit client rather than a third party, but there is no reason to believe that a more lenient rule would apply to third parties suing as plaintiffs under the *Ultramares–Credit Alliance* doctrine. Here, according to DED's own complaint, AA issued its last audit report on or about March 16, 1981 (SAC ¶166), and DOC received this report no later than May 26, 1981, more than three years before this suit was filed. *See* Zirin Aff.Ex. 180 ¶11. That suggests that DED's negligence claim is time barred.

However, under New York tolling rules applicable here,[12] *Walker v. Armco Steel Corp.,* 446 U.S. 740, 746, 100 S.Ct. 1978, 1983, 64 L.Ed.2d 659 (1980), "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713, 716 (1978); *see also Ackerman,* 84 N.Y.2d at 541, 620 N.Y.S.2d at 320, 644 N.E.2d at 1011 ("A malpractice cause of action sounds in tort and, therefore, *absent fraud,* accrues when an injury occurs") (emphasis supplied). To invoke equitable estoppel, a plaintiff must act diligently by suing "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Simcuski,* 44 N.Y.2d at 449, 406 N.Y.S.2d at 263, 377 N.E.2d at 717.

DED argues that it did not discover DeLorean's misuse of the GPD contract proceeds until November 1983, when Jacques Wittmer—the Swiss lawyer who maintained the GPD escrow account on behalf of DeLorean—and the Pierson Bank turned over loan documents to the DMC creditors' committee. DED alleges that AA had concealed this fraud by continuing to certify DMC's financial statements without disclosing its knowledge of DeLorean's misconduct. DED charges that as late as 1983, AA falsely claimed to be ignorant of irregularities in connection with the GPD contract. *See* Letter from Barrett to Joint Receivers of DMCL, Apr. 22, 1983, Schade Aff.Ex. 501 p. 2. AA argues that DED has it backwards: in fact, AA claims, DED had reason to know all along what was going on, while AA did not.

The dispute over concealment goes to the merits of the fraud claims. As explained above in Part IV.(1)(b) of this opinion, it is not clear what AA knew about the GPD contract, when AA knew it, and whether and to what extent anyone at AA knowingly concealed DeLorean's misappropriations. Similarly, it is difficult to make a conclusive determination on the basis of the discovery materials as to DED's knowledge of DeLorean's misconduct at different times between 1978 and 1983. Because reasonable jurors could reach different conclusions from the evidence in the record, and because I find that DED's 14–month delay in filing this complex action does not as a matter of law demonstrate a lack of diligence in pursuing the claim, summary judgment on this ground is not appropriate.

### (10) *Breach of Contract*

AA argues that it cannot be liable to DED for breach of contract because NIDA and DOC were not intended third party beneficiaries of AA's contracts with the DeLorean entities.

Under New York law, a third party may recover for damages flowing from a breach of contract only when that party is an intended beneficiary of the contract. *Flickinger v. Harold C. Brown & Co.,* 947

---

12. As discussed above in Part IV.(8) of this opinion, DED has suggested that Michigan law might apply here, but neither party has addressed the content of Michigan law. Consideration of whether Michigan law applies, and whether it differs from New York law, will await trial, if there is one and if it is then necessary.

F.2d 595, 600 (2d Cir.1991). In deciding whether a party is an intended beneficiary of contract, New York courts follow the Second Restatement of Contracts, *id.*, which provides that a third party is an intended beneficiary if

> recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302(b) (1979). The inquiry is informed by "the surrounding circumstances as well as the agreement." *Barnum v. Millbrook Care Ltd. Partnership,* 850 F.Supp. 1227, 1233 (S.D.N.Y.) (*citing Septembertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 679 (2d Cir.1989)), *aff'd without opinion,* 43 F.3d 1458 (2d Cir.1994).

Under the Restatement and New York law, great weight is accorded to "the expressed intent of the promisee." *Barnum,* 850 F.Supp. at 1234 (*citing Drake v. Drake,* 89 A.D.2d 207, 209, 455 N.Y.S.2d 420, 422 (4th Dep't 1982)). However, the intent to benefit a third party need not be expressly stated in the contract. *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991). In fact, it is not necessary even that the identity of the third party be known at the time the contract is signed. *MK West St. Co. v. Meridien Hotels, Inc.,* 184 A.D.2d 312, 313, 584 N.Y.S.2d 310, 312 (1st Dep't 1992).

AA's engagement letters to perform work for the DeLorean entities do not refer to NIDA or DOC. *See* Zirin Aff.Exs. 104, 105, 150, 169, 194. However, the promisee DeLorean entities undertook in the Master Agreement to furnish to NIDA and DOC "within 120 days following the end of [DMC's] fiscal year ... a consolidated balance sheet at the end of such fiscal year and a consolidated statement of income for such year, together with notes thereto and the report thereon of DMC's auditors." Master Agreement ¶ 6.1.5(b), Zirin Aff.Ex. 49 at 130. By retaining AA to perform audits, the DeLorean entities fulfilled a condition to the obligation of NIDA and DOC to furnish financial assistance. In addition, there is evidence that AA recognized that NIDA and DOC were the intended beneficiaries of AA's promises to the DeLorean entities. For example, as previously noted, Barrett wrote in a December 1978 letter to Strycker that "[y]ou indicated to us ... that it would be desirable to have [a separate] audit report prepared ... on [DMCL] so that this could be given to NIDA and the Department of Commerce to indicate clearly how the project is progressing to date." Schade Aff.Ex. 420 ¶ 4(c). Similarly, the minutes of a November 19, 1980 DMC audit committee meeting attended by James Sim, a NIDA-appointed DMC director, show that an AA representative "indicated that he believed NIDA requirements would be met by the preparation of financial reports according to [generally accepted accounting principles]." Schade Aff.Ex. 259 at 3.

This and other evidence support the conclusion that DeLorean did not retain AA simply to fulfill routine public filing requirements. DMC and DMCL were not established companies that needed to file annual reports only to comply with government regulations. Rather, DMC and DMCL were start-up companies that owed their existence to a few large investors, principally NIDA and DOC. AA cannot seriously contend that it did not appreciate the significant role of NIDA and DOC in the DMCL venture. At a minimum, DED has raised an issue of fact as to its status as an intended third beneficiary, and because AA has not raised any other contract defenses here, summary judgment must be denied on the breach of contract claim.

*(11) Aiding and Abetting Common Law Fraud*

AA argues that DED's claim for aiding and abetting common law fraud must be dismissed because there is no such tort under New York law. AA relies on *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 452 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). In *Cenco,* securities purchasers sued the issuer's accountants, charging that the accountants' audit reports on the issuer's financial statements were

fraudulent. The Court dismissed plaintiffs' claim for aiding and abetting common law fraud, finding that "[t]here is no tort of aiding and abetting under Illinois law or, so far as we know, the law of any other state...." 686 F.2d at 452.

■ However, both parties agree that New York law governs this action, and contrary to the Seventh Circuit's sweeping generalization, New York courts have recognized a cause of action for aiding and abetting common law fraud. *See, e.g., Curiale v. Peat, Marwick, Mitchell & Co.,* 214 A.D.2d 16, 28, 630 N.Y.S.2d 996, 1002–03 (1st Dep't 1995) (plaintiff entitled to jury trial on claim of aiding and abetting common law fraud); *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 204 A.D.2d 218, 218, 612 N.Y.S.2d 39, 40 (1st Dep't 1994) (denying defendant's motion for summary judgment on claim for aiding and abetting fraud); *Joel v. Weber,* 166 A.D.2d 130, 139, 569 N.Y.S.2d 955, 961 (1st Dep't 1991) (plaintiff sufficiently pleaded cause of action for aiding and abetting common law fraud); *National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 149, 511 N.Y.S.2d 626, 630 (1st Dep't) (aiding and abetting may be established by knowledge of the fraud and intent to advance the fraud's commission), *appeal denied,* 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987).

One Court in this district explicitly rejected the holding in *Cenco* and surmised, in the absence of New York state authority on the issue, that "the Second Circuit would ... recognize the tort of aiding and abetting a common law fraud." *Aeronca, Inc. v. Gorin,* 561 F.Supp. 370, 376 (S.D.N.Y.1983). The Court based this conclusion in part on Second Circuit decisions recognizing a cause of action for aiding and abetting securities fraud under Rule 10b–5. Those decisions have been rejected by the Supreme Court's holding directly to the contrary in *Central Bank of Denver,* as explained above in Part I.C of this opinion. Nevertheless, the recent New York state authority cited above makes it unnecessary to rely on *Aeronca.*

Because New York courts permit recovery for aiding and abetting common law fraud, AA's motion for summary judgment is denied as to that claim.

**(12)** *Recoverability of Grants*

■ Nearly £30 million of the financial assistance provided to DMCL by DOC was in the form of grants. (SAC ¶¶ 44(a)–(b), 43(b)) AA argues that "[b]ecause [DOC] never contemplated that these monies would be repaid, [DED] cannot seek repayment thereof from [AA]." (Def.Mem. at 214)

DOC paid grants pursuant to provisions in the Master Agreement calling for various forms of financial assistance from the British government in consideration for, *inter alia,* the location of DMCL's factory at Dunmurry, debt and equity interests in DMCL, and "[o]ther appropriate fees." (Master Agreement Preamble ¶ 3, Zirin Aff.Ex. 49 at 127) The grants thus were not a gift but were part of a bargained-for exchange.

■ Under New York law, "a breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission." *K.M.L. Laboratories Ltd. v. Hopper,* 830 F.Supp. 159, 163 (E.D.N.Y.1993) (*citing Babylon Assoc. v. Suffolk County,* 101 A.D.2d 207, 475 N.Y.S.2d 869 (2d Dep't 1984)). The non-breaching party will be discharged from the further performance of its obligations under the contract when the breach "goes 'to the root of the contract.'" *Id.* (*quoting Direction Assoc., Inc. v. Programming & Sys., Inc.,* 412 F.Supp. 714, 719 (S.D.N.Y.1976)). Put another way, rescission is permitted when a breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Id.* (*quoting Callanan v. Keeseville, Ausable Chasm & Lake Champlain R.R.,* 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910)).

DED has adduced evidence that DeLorean misappropriated millions of dollars from DMCL, the company he dominated. A jury reasonably could conclude that DeLorean siphoned away for other uses funds that DMCL was obliged to spend on research and development for the DMC–12 sports car. A misuse of funds on that scale surely would have constituted a material breach of the Master Agreement, and would have discharged DOC from any further obligations.

*See generally* Master Agreement ¶ 5.1.3, Zirin Aff.Ex. 49 at 129 ("[DMCL] covenants and agrees [that it shall] ... [n]ot make any substantial alteration in the general nature of the business to be carried on by [DMCL], nor depart materially from the Corporate Plan"). If AA deliberately concealed fraud, then AA prevented DOC from rightfully refusing to pay the grants, and can be held responsible for the losses DOC suffered. As noted above in Part IV.(1)(b) of this opinion, DED has raised issues of fact as to AA's knowledge of the fraudulent activities of DeLorean and his accomplices, and as to the quality of AA's audit reports. Thus, AA is not entitled to summary judgment denying recovery based on grants paid by DOC to DMCL, except to the extent such recovery is precluded under Rule 10b–5 as discussed above in Part IV.(1)(a).

### (13) *Claims Against Measelle, Massura, and Beckman*

Defendants Richard L. Measelle, Edward A. Massura, and Richard E. Beckman argue that because they were not named in the caption of the complaint until 1994, all claims against them are time-barred. Measelle was the engagement partner for the DeLorean entities at AA's Detroit office and currently is the worldwide head of AA's audit and tax business. Massura was and remains a partner at AA's Detroit office specializing in tax matters. Beckman was an audit partner in AA's Detroit office who left the firm in 1991. (Def.Mem. at 215 n. 174)

In the initial complaint, filed February 19, 1985, DED named as defendants only three entities: Arthur Andersen & Co. (USA), Arthur Andersen & Co. (Republic of Ireland), and Arthur Andersen & Co. (United Kingdom). The individual defendants were mentioned in paragraph 103(d) of the document, which charged that in 1979, (1) Measelle failed to investigate suspicions about the GPD contract articulated by DMC's financial officers, and (2) Measelle, Massura, and Beckman failed to investigate DeLorean's inconsistent accounts of the circumstances surrounding his repayment of the Continental Illinois loan and the source of the Pierson loan proceeds. (Compl. at 66).

In the First Amended Complaint, filed July 14, 1988, DED asserted that "Measelle, Massura and Beckman are named as defendants in this action because, pursuant to [New York Civ.Prac.L. & R.] § 1025, by naming AA–USA as a defendant, plaintiff effectively has named every partner therein as a defendant." (FAC (Zirin Aff.Ex. 1) ¶ 180 at 185) The First Amended Complaint contained numerous specific references to conduct by each of the individual defendants that DED alleges gives rise to liability, but the caption of the complaint did not list the individuals as defendants.

On September 23, 1988, the parties filed a stipulation that Measelle, Massura, and Beckman

> shall not be required to answer, move with respect to or otherwise respond to the First Amended Complaint unless and until a motion by plaintiff for leave to amend the caption thereof shall have been made and thirty (30) days shall have elapsed following the granting thereof.

Zirin Aff.Ex. 285. DED amended the caption to include the three individuals as defendants in May 1994 when the Second Amended Complaint was filed. The parties do not dispute that the Second Amended Complaint was personally served upon the three individual defendants.

It is not absolutely necessary to list an individual in the caption of the complaint in order to name that individual as a defendant in the action. *See Johnson v. United States,* 680 F.Supp. 508, 514–15 n. 6 (E.D.N.Y.1987) ("the omission of a name from a caption is not determinative of whether a defendant is properly in a case"); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1321 (2d ed. 1990) ("Although helpful to the court, the caption ... is not determinative as to the parties to the action").

The liability of members of an unincorporated association for the debts of the association is a matter of substance on which state law governs under the doctrine of *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Cf. Aries Ventures Ltd. v. Axa Finance S.A.,* 729

F.Supp. 289, 295–96 (S.D.N.Y.1990) (liability of shareholders to corporation's creditors is governed by state law). The court also must apply the forum state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). New York courts judge the liability of partners of an out-of-state partnership according to the laws of the jurisdiction where the partnership was organized. *Strain v. Seven Hills Assoc.,* 75 A.D.2d 360, 363, 429 N.Y.S.2d 424, 426 (1980). AA was organized under the laws of Illinois. *See* SAC ¶ 5(a)(i); *see also Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 28 (D.C.Cir. 1987) (AA–USA is "an American general partnership organized under the laws of Illinois").

■ Under Illinois law, partners do not enjoy limited liability for the debts and obligations of the partnership. Ill.Ann.Stat. ch. 805, para. 205–15 (Smith–Hurd 1995). However, a creditor can recover against an individual partner's personal assets only after process has been personally served on that partner. *See id.* ch. 735, para. 5/2–205(b) ("When a personal judgment is sought against a known partner for a partnership liability the partner may be served (1) in any manner provided for service on individuals or (2) by leaving a copy of the summons for him or her with any other partner and mailing a copy of the summons in a sealed envelope with postage prepaid, addressed to the partner against whom the judgment is sought at his or her usual place of abode"). That provision appears to parallel the New York rule that

> service on a partnership by service of a summons and complaint on one of the partners will subject partnership assets to the claims of the complaint. However, personal liability of the individual partners may only be had by personal service on that partner.

*Gatley v. Deters,* 128 Misc.2d 209, 489 N.Y.S.2d 684, 685 (Sup.Ct. Niagara County 1985) (*citing Golia v. Health Ins. Plan of Greater New York,* 6 A.D.2d 884, 177 N.Y.S.2d 550 (2d Dep't 1958), *aff'd,* 7 N.Y.2d 931, 197 N.Y.S.2d 735, 165 N.E.2d 578 (1960)). *See* N.Y.Civ.Prac.L. & R. 1025 (McKinney 1990).

Thus, the statute of limitations was tolled in this action for purposes of the personal liability of Measelle, Massura, and Beckman whenever each of these defendants was personally served with process. The parties have traded conclusory allegations as to whether personal service of the original complaint was effected in 1985 when that complaint was filed with the court. DED alleges that Measelle, Massura, and Beckman were personally served with that complaint (SAC ¶ 222(a)(ii)), but does not indicate how or when they were served. The individual defendants deny that they were personally served with the original complaint. (Def.Mem. at 216 n. 175)

DED has filed affidavits with the Clerk of Court indicating that (1) Measelle's authorized agent was served with the First Amended Complaint in Chicago on July 21, 1988, (2) Massura received personal in-hand service of the First Amended Complaint in Detroit on July 21, 1988, and (3) Beckman's secretary was served with the First Amended Complaint on August 4, 1988 in Detroit, and copies were sent by first class mail to Beckman's work address. S.D.N.Y. File No. 85 Civ. 1292, Doc. No. 69.

Assuming that the above-described attempts at personal service were effective, the statute of limitations was tolled for purposes of the personal liability of the individual defendants no later than 1988 on the dates indicated. However, because neither party has set forth any facts as to the time or circumstances of any attempted personal service of the original complaint, a material issue of fact remains as to whether personal service was effected in 1985. Accordingly, the individual defendants are not entitled to summary judgment on statute of limitations grounds.

Of course, if DED proves that personal service was effected in 1985 or 1988, that service will toll the statute of limitations only as of the date of service. To survive the statute of limitations defense as to at least some of the claims herein, DED will have to prove at trial that the statute of limitations also should have been tolled at some earlier

time by reason of AA's concealment of the fraudulent acts giving rise to DED's claims. *See* Part IV.(9) *supra.*

### (14) *Pendent Jurisdiction*

Because AA's motion for summary judgment has been denied with respect to DED's substantial federal securities fraud claim under Rule 10b–5, jurisdiction over the pendent state law claims will be retained at this time. *See* Part II *supra.*

### (15) *Public Filing of the Parties' Memoranda of Law*

■ On January 27, 1989, DED and AA filed a confidentiality agreement signed by counsel for both parties and Judge Stewart. Under the agreement, both parties agreed to treat all material produced in discovery by either party as confidential. Confidentiality Agreement ¶ 2, Zirin Aff.Ex. 267 at 3. In addition, each party agreed to wait five days before publicly filing any legal memoranda making reference to discovery materials in order to permit the other party to move for an order directing that the memoranda be filed under seal. Confidentiality Agreement ¶ 6, Zirin Aff.Ex. 267 at 5.

In a 1991 ruling, Judge Stewart ordered DED to produce for discovery numerous documents containing "records of the deliberative process of departments and agencies of the British Government." 139 F.R.D. 295, 299 (S.D.N.Y.1991). DED had objected to the document production request on the ground that the requested materials were protected by executive privilege. The Court rested the order to compel on two alternatively sufficient grounds.

First, the Court reasoned that "[w]hen a plaintiff files an action it may be said that he automatically waives certain privileges by 'implied intention.' " *Id.* at 298 (citation omitted). The Court stressed that "[t]his is true even when the plaintiff is· a governmental entity." *Id.*

Second, the Court found that disclosure was necessary under a "balancing the equities" approach. The Court listed the following factors as relevant to the determination:

(1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and the issues involved; (4) the role of the government in the litigation; (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable; (6) the societal interest of accurate judicial fact-finding; and (7) the public interest in opening for scrutiny the government's decision making process.

*Id.* When balancing these factors, "[t]he federal interest in full development of the facts should be given the greatest weight. . . ." *Id.* at 299 (*quoting Skibo v. City of New York,* 109 F.R.D. 58, 61 (E.D.N.Y.1985)). As a threshold matter, the Court observed that the January 27, 1989 confidentiality agreement "significantly minimized" DED's concerns about public disclosure. *Id.* at 299. The Court concluded that because DED's fraud claims turn on "issues of knowledge, reliance, and causation, direct evidence of the deliberative process is irreplaceable. The governmental privilege must give way." *Id.*

The memoranda of law filed by both parties on this motion contain many excerpts from discovery materials, and therefore come within ¶ 6 of the January 27, 1989 confidentiality agreement, which requires each party to give its adversary five days to move for filing under seal. To avoid yet another adventure in satellite litigation, both parties filed the memoranda and accompanying exhibits for this motion under seal on the understanding that the issue would be resolved here along with the substantive issues addressed above. Pursuant to Fed.R.Civ.P. 5(d) and S.D.N.Y.Civil Rule 18(a), the discovery materials in this case have not been filed with the Clerk of the Court. AA now asks the court to unseal the motion papers because the "documents and testimony here at issue involve neither trade secrets nor national security." (Def.Mem. at 233) DED vigorously protests, arguing that it produced sensitive documents under seal in reliance on the assumption that their contents would remain confidential. (Pl.Mem. at 490) DED also reminds the court that a confidentiality order cannot be modified or vacated in the Second Circuit absent "compelling need" or

an "extraordinary circumstance." *Federal Deposit Ins. Corp. v. Ernst & Ernst,* 677 F.2d 230, 231 (2d Cir.1982).

 Confidentiality agreements are interpreted according to contract principles. *City of Hartford v. Chase,* 942 F.2d 130, 134 (2d Cir.1991). Under the plain language of ¶ 2 of the January 27, 1989 agreement, AA remains obligated to keep confidential the materials produced by DED pursuant to Judge Stewart's 1991 ruling. But DED's reliance on the "compelling need or extraordinary circumstance" test is misplaced, because AA is not moving to vacate an existing confidentiality order. AA did not agree in ¶ 6 of the confidentiality agreement to file its motion papers under seal; AA agreed only to give DED the opportunity to move for an order directing that the legal memoranda be filed under seal, and to leave the memoranda under seal until the court ruled on DED's motion. That this motion has taken a long time to resolve does not mean that a confidentiality order has been issued.

Moreover, even if AA had agreed to file its memoranda of law under seal, that agreement would not be binding on the court because in this context "the public right to know how the judicial branch is functioning is implicated." *Gottlieb v. County of Orange,* 151 F.R.D. 258, 260 (S.D.N.Y.1993). An adjudication such as a summary judgment "is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny." *Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *see also United States v. Amodeo,* 71 F.3d 1044, 1049 (2d Cir.1995) ("the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts").

 Thus, in the Second Circuit, "documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons." *Joy,* 692 F.2d at 893. Under Fed. R.Civ.P. 26(c), the court may issue a protective order to protect a party from "annoyance, embarrassment, oppression, or undue

burden or expense" only upon a showing of "good cause." "Good cause" is not established merely by the prospect of negative publicity. *Gelb v. American Telephone & Telegraph Co.,* 813 F.Supp. 1022, 1035 (S.D.N.Y.1993). A party seeking to file documents under seal generally must show both that the documents are confidential and that disclosure will result in a "clearly defined and very serious injury." *United States v. Talco Contractors, Inc.,* 153 F.R.D. 501, 514 n. 5 (W.D.N.Y.1994); *Cuno Inc. v. Pall Corp.,* 117 F.R.D. 506, 508 (E.D.N.Y.1987); *Koster v. Chase Manhattan Bank,* 93 F.R.D. 471, 479–80 (S.D.N.Y.1982); *United States v. International Business Machs. Corp.,* 67 F.R.D. 40, 46 (S.D.N.Y.1975). That showing requires "specific and particular demonstrations of fact, not stereotyped or conclusory statements." *Alfadda v. Fenn,* 149 F.R.D. 28, 34 (S.D.N.Y.1993).

DED has opposed AA's request to unseal only with the blanket claim that the legal memoranda and exhibits thereto should remain entirely sealed. (Pl.Mem. at 500) DED's unparticularized assertion that all of the relevant materials are sensitive will not suffice. Instead, if DED wants any portion of those materials to remain under seal, it must make particularized requests for redaction with compelling justifications for each request. The opportunity to do so will be provided at a forthcoming conference. If AA wishes that the legal memoranda be redacted to preserve the confidentiality of any materials it has produced, it too must make such a showing. The memoranda will remain under seal until the issue is resolved at that conference.

## V.

To summarize:

(1) Summary judgment is granted in favor of AA on all the RICO claims, including the claim for aiding and abetting RICO violations.

(2) Summary judgment is granted in favor of AA with respect to the Rule 10b–5 claim to the extent the claim is based on DED's purchase of DMCL preferred shares pursuant to the original

Master Agreement, but otherwise is denied.

(3) Summary judgment is denied with respect to the claims for negligence, breach of contract, and aiding and abetting common law fraud.

(4) At a forthcoming conference, the parties will make particularized requests for redaction of the parties' memoranda of law, which thereafter will be unsealed to the extent appropriate.

The following claims survive: negligence, breach of contract, common law fraud, aiding and abetting common law fraud, and securities fraud under Rule 10b–5 (to the extent specified above).

 * * * * * *

For the reasons set forth in Part IV of this opinion, defendants' motion for summary judgment is granted in full as to the sixth, seventh, and eighth claims for relief in the Second Amended Complaint, and in part as to the fifth claim for relief as explained above. The motion otherwise is denied.

SO ORDERED.